# WILL ROSE v. STATE.

No. A-1160.   Opinion Filed November 18, 1912.

(127 Pac. 873.)

1. **APPEAL—Briefs—Preparation.** It is the duty of counsel for an appellant to prepare the transcript of the record and their briefs in such a manner that they can be read by this court. If the briefs are typewritten, they should not be on onionskin paper, and so indistinct as to make it difficult to read them.

2. **CONTINUANCE—Grounds—Proceedings to Procure.** (a) An application for a continuance is addressed to the sound discretion of the trial court, and a conviction will not be reversed upon appeal upon the ground that the trial court erred in overruling an application for a continuance, unless it appears from the record that appellant was injured thereby.

   (b) Before a defendant applies for a continuance, it is his duty to exhaust all of his legal remedies to obtain the presence of his witnesses, and this must affirmatively appear in the application for a continuance, otherwise the application will be bad on its face.

   (c) As a general rule, a continuance will not be granted to allow a defendant to obtain cumulative testimony.

   (d) Although an application for a continuance may be good upon its face, yet where it is overruled, and upon the trial of the case it appears from the whole record that the testimony for which the continuance was sought could not have affected the result of the trial, a conviction will not be reversed.

3. **PERJURY—Elements—Statutory Provisions.** (a) Section 2183, Comp. Laws 1909, which declares that ''an unqualified statement of that which one does not know to be true, is equivalent to a statement of that which one knows to be false,'' is no part of the definition of perjury. It does not create a separate offense or establish a rule of pleading.

   (b) Upon an indictment drawn under section 2176, Comp. Laws 1909, defining perjury generally, a conviction may be had upon proof made as provided in section 2183—that the accused had made an unqualified statement of that which he did not know to be true, provided the jury are satisfied beyond a reasonable doubt that such statements were made willfully and deliberately and with the corrupt intention that they should be accepted and believed as true. A criminal and corrupt intent is a vital element in the crime of perjury.

4. **PERJURY—Evidence—Sufficiency.** For facts which justify and require a verdict of guilty of perjury, see opinion.

(Syllabus by the Court.)

*Appeal from District Court, Bryan County;*
*Summers Hardy, Judge.*

Will Rose was convicted of perjury, and his punishment assessed at 10 years in the state penitentiary, and he appeals. Affirmed.

W. R. Collins testified that he was clerk of the district court of Bryan county, Okla.; that in 1909 a prosecution was pending in said court against R. Coleman, who was charged with the crime of perjury, and upon the trial of Coleman appellant appeared and was duly sworn, and testified as a witness in behalf of the defendant. The indictment, files, and record in the case of the State of Oklahoma v. R. Coleman were introduced in evidence. We will quote in full from the stenographic report of the testimony of appellant upon the trial of R. Coleman, as this is the evidence upon which the charge of perjury was based and which was proven in this case:

"Q. Do you recollect the occurrence, or, rather, a certain night that an occurrence that happened in a storm cellar at Colbert about February or March last year at the time Henry·Roberts came up on some parties in a storm cellar? A. Yes, sir. Q. Were you in that storm cellar at that time that night? A. Yes, sir. Q. About what time of the day or night did you go to that storm cellar? A. I was there two different times. Q. The first time you went there? A. I suppose about 9 o'clock. Q. Who did you go with that first time? A. I went with Mr. Coleman. Q. R. Coleman? A. Yes, sir. Q. You and he went together there about 9 o'clock that evening? A. Yes, sir. Q. Did you go down in the·storm cellar? A. Yes, sir. Q. Who was in there at that time, do you recollect? A. There was two or three boys in there. Q. Do you recollect who they were? A. Yes. Q. Who were they? A. Vernon Badgett, Ed Goosby, and—I don't know. There was three boys, but I couldn't say for certain, but I think it was Walter Rogers. Q. You are not positive about that? A. No, sir. Q. About 9 o'clock that evening? A. About nine. Q. How long were you and this defendant in the storm cellar on that occasion? A. We was there I suppose about 10 minutes, all told, at that time. Q. After the expiration of that 10 minutes, did you and this defendant do anything? A. We went out of there. Q. Out of where? A. The cellar. Q. Where did you go? A. To the barber shop. Q. Where did Mr. Coleman go? A. He went

to Leecraft's store, right there across the street. I don't know whether he went to Leecraft's store or to the drug store. I went across the street to the barber shop. Q. You left Mr. Coleman at the drug store, and went across the street? A. You know the drug store and Mr. Leecraft's store join, and, when I went across the street, I left him in front of Leecraft's store. Q. Did you walk with him down to that point from the storm cellar? A. Yes, sir. Q. How long were you in that barber shop do you suppose? A. I don't know, two or three fellows was in there ahead of me for a shave. I guess I was there about 30 minutes. Q. Well, after you left the barber shop, where did you go? A. I went back across the street, and Coleman was standing there. Q. Where? A. Out in front of this drug store, and he and I went on back up to the storm cellar. Q. About what time was that do you suppose? A. I don't know. I guess I stayed over at the barber shop there in town, and it was breaking up when I got through shaving. We all went there, and the show had broken up, and we went on back down to the cellar. Q. Who was in the cellar when you all went back the second time? A. Well, there was four or five boys in there then. Q. Who were they? A. Well there was Ed Goosby, Vernon Badgett, Walter Rogers, I guess that was all that was in there then, and Vernon Bell. Q. Anybody else? A. Yes; Oscar Askew, he was in there. Q. Do you remember whether or not George Hinson was there at that time? A. Yes; he was there. Q. Give all the parties who were there? A. That is all I remember. Q. What were those boys doing in the storm cellar? A. They were sitting around in there. Q. Sitting on seats? A. When they dug the dugout, they left banks on each side; and they were sitting around, wasn't doing anything, just talking. Q. Were they drinking? A. No, sir; not that I know of. Q. State to the jury whether or not you saw any crap shooting or anything of that sort? A. No, sir. Q. Did you see this defendant at this time engage in any gambling game? Did you see him shooting any craps? A. No, sir. Q. Play any poker? A. No, sir. Q. Win or lose any money? A. Never seen him win any money. Q. Did you see anybody in his presence while you were with him shoot any craps? A. No, sir. Q. Play any poker? A. No, sir. Q. Or win or lose any money at any gambling game? A. No, sir. Q. About how long had you and this defendant, Mr. Coleman, been there before Mr. Roberts, on this second trip I am talking about, before Mr. Roberts came to the storm cellar? A. Just a short time I suppose. Q. Your best judgment? A. Not over 10 minutes I guess, then or 15 minutes. Q. What was the first thing said by Mr. Roberts, or any one of his party? A.

He called Mr. Coleman to come out there. Q. Do you remember his exact language or words? A. I think he just said, 'Come out here, Puck.' Q. Do you remember the reply made by the defendant R. Coleman? A. Yes; he never replied but once. Q. What did he say? A. Everything was quiet for a minute or two, and he said 'Do you want me, Mr. Henry?' and Mr. Roberts, the deputy sheriff, told him, 'Yes,' and he walked on out and three other boys went out with him. Q. Who? A. Vernon Badgett, George Hinson, and Oscar Askew. Q. State whether or not you went out about the time the defendant did? A. No; I stayed in. Q. How long did you stay in there after he had gone out? A. Two or three minutes I guess. Q. Did you hear any statements that were made by Mr. Coleman or Mr. Roberts after Mr. Coleman went out? A. No, sir. Q. Where were the parties when you came out of the storm cellar? A. These boys? Q. Well, yes; Mr. Roberts and Mr. Coleman. A. They were out in the street, the four of them, and the officers and all of them. Q. Did you hear any statements made by any of that crowd after they had gone out in the street? A. Yes, sir. Q. What was it? A. I went out. I stayed in the cellar until I thought the 'booger' man had gone, and then I went out and climbed over the fence, and I seen the four men standing there, and I went up to the crowd, and Mr. Henry Roberts asked me was I in that cellar. He said he didn't see any storm coming up, and he was laughing, and about that time Mr. Coleman and those three boys that went out with him walked up and Mr. Coleman and Mr. Bowles engaged in a difficulty. Q. Did you hear any statement made after their difficulty or altercation had terminated, by this defendant? If so, please state what it was. A. He said something or other to Mr. Bowles, and Mr. Bowles called him a dirty stinking liar. Q. The defendant? A. Yes. Q. After the difficulty, did you hear any statement made by the defendant? A. Yes, sir. Q. What was it? A. Mr. Roberts taken him by the arm and said come on, and he made the remark he had the money to pay his fine. Q. That statement was made by Mr. Coleman? A. Yes; that is all the statement I heard him make. Q. Well, state to the jury whether or not you and Puck had a bottle of whisky that night? (Counsel for plaintiff objects on the ground that is is immaterial. Objection sustained.) Q. I will ask you this question: State to the jury whether or not you and Puck had been drinking together that evening. (Counsel for plaintiff objects, first, on the ground that it is immaterial, and, second, on the ground that it is leading. Objection sustained. Defendant excepts.) Q. I will ask you for what purpose chiefly you and Puck went to the storm

cellar that evening, the first time? (Counsel for plaintiff objects. Objection overruled.) A. We went over there to take a drink. Q. Did you take a drink. A. Yes, sir. (Counsel for plaintiff objects. Objection overruled.) Q. Well, I will ask you what really was the object of you boys meeting in that storm cellar on that occasion, if it wasn't for the purpose of drinking? (Counsel for plaintiff objects.) Court: Ask the object, but don't suggest the answer. Mr. Crook: I will withdraw the question. That's all."

Ed Goosby testified in behalf of the state that he resided in Colbert; that on the 17th day of November, 1908, about half past 10 or 11 o'clock at night, Will Rose, the appellant, Oscar Askew, Puck Coleman, Vernon Badgett, Vernon Bell, John Goosby, John Hinson, and Walter Rogers were down in a cellar in the town of Colbert; that they had been there about an hour gambling with dice for money; that a quilt was hung up which covered the door; that they were all sitting on a kind of bench on each side of the cellar which ran around on the sides near the bottom of the cellar; that appellant both won and lost money; that witness saw appellant throwing dice during the game. On cross-examination witness testified as to what he had been drinking, but that he was not drunk at the time this game was going on. Witness saw appellant put money down on the game. Appellant drank some whisky down in the cellar. A light was burning in the cellar. Witness heard the officers when they came. Witness and appellant stayed in the cellar when the officers came.

George Henson testified in behalf of the state: That he resided at Colbert. That he was acquainted with appellant Will Rose, had known him for about 12 years. Witness remembers the occasion in February or March when Henry Roberts went to a cellar out there in Colbert where a crowd of boys were in there. Witness was in the cellar at the time. They were all gambling. That Puck Coleman, Oscar Askew, Will Rose, John Goosby, Vernon Badgett, and witness were present at the time. That they were all shooting craps together for money. During this time appellant Will Rose sometimes threw the dice. The cellar was entered through a door on the east end and steps went down to the bottom. The door had a blanket in front of it to

obstruct the view. The boys had a lantern in the cellar, by the light of which they threw the dice, and a little shelf or bench running around on the sides of the dugout upon which they sat. This was about a foot and a half from the door. The cellar was built out of logs and dirt over the logs.

John Goosby testified in behalf of the state: That he lived at Colbert. That he remembers the occasion in February or March, 1908, when Mr. Roberts came down in a cellar near Colbert, and found some boys gambling. That witness was present. That appellant Will Rose was there and a number of others. That R. Coleman, sometimes called "Puck" Coleman, was present also. That all present were shooting craps for money. That a curtain was hanging over the door of the cellar. That sometimes "two bits" was put up on a game, sometimes a dime, sometimes a dollar, and sometimes two dollars were put up on a game. Witness knows that appellant Will Rose engaged in such game. He saw him both shooting craps and betting on the game. When the officers came, they blew out the light and all sat down. Mr. Roberts opened the door, and told them to come out. Coleman, Vernon Badgett, George Hinson, and Oscar Askew went out. The other boys remained in the cellar. Appellant did not go out at this time. After the officers went away, the rest of the boys came out of the cellar and went home. Witness had been in the cellar shooting craps and gambling about half an hour before the officers came. When the boys who remained in the cellar came out after they thought the officer had left, witness saw appellant running away from the cellar.

Joe Pruitt testified in behalf of the state that he resided in Colbert, and remembers the occasion when the officers came to the cellar in that town, and found the boys gambling; that witness went to the cellar about 8 o'clock that night, and found appellant Will Rose and the other boys. Witness stayed 15 or 20 minutes. Coleman turned around, and says to appellant, "Will, some of you boys come up to my office and get some blankets." Appellant said to some of the other boys, "Come on," and some of the boys went with him to get the blankets and hung one up over the door

of the cellar. Witness then left. The next day witness learned that the officers arrested the boys for gambling in the cellar.

W. S. Bowles testified for the state: That the cellar in question in the town of Colbert was his property. That on the night in question he noticed a light in the cellar. He went and told Mr. Roberts. Roberts looked in at the ventilator. Witness opened the door. He could not see anything when he first opened the door, but Bob Cordell had a dark lantern and threw the light in the cellar door. There was a blanket hanging down there on the bottom which covered the entire entrance. Mr. Roberts called on the boys to come out. Four came out.

Milt McPherson testified for the state: That he was constable at Colbert at the time of the occurrence in question. Mr. Roberts was then deputy sheriff of Bryan county. That, in company with Mr. Roberts, Mr. Cordell, and Mr. Bowles, witness went down into the cellar in question. When they went to the cellar, they could see the reflection of a light in it. Mr. Roberts spoke up, and said, "Come out boys, we have got you." Four boys came out. .

Henry Roberts testified for the state: That he was deputy sheriff of Bryan county, Okla., in February or March, 1908. They were looking for persons who were gambling. That they heard a noise in the cellar which was the property of Mr. Bowles. That witness looked through the ventilator and saw some money and men down in the cellar. Witness heard some one in the cellar say: "Come in the game. You can't win no money and stay out of the game." Witness then went in at the door and the light went out. Mr. Cordell, who was with witness, then threw his flashlight down there, and a blanket was hanging over the door from top to bottom which obstructed the view, so he could not see who was in the cellar. Witness then called to the boys to come out of the cellar. Four of them came out. Witness then placed the four men under arrest, and went away with them.

The state then rested its case.

J. E. Parkey testified in behalf of appellant: That he was postmaster at the town of Colbert. That on the evening of February 22, 1908, he saw appellant in the town of Colbert. He

appeared to be drunk, although he walked all right. Witness did not hear appellant talk.

Crockett Davis testified in behalf of appellant that he saw appellant on the 22d day of February, 1908, about 8 o'clock. He appeared to be drunk.

Joe Pruitt testified for the state in rebuttal: That he was in the cellar with appellant at the time the gambling occurred in Colbert. At this time appellant was duly sober. That his language and conduct was as natural as it always is.

H. E. Roberts testified that he saw appellant on the night of the gambling in the cellar at Colbert; that he appeared to be drinking, but was not drunk; that he heard appellant talk, and could not notice any difference in his conversation; that appellant did not stagger when he walked.

Milt McPherson testified for the state that he saw appellant on the night of the gambling in question; saw him walk and he did not stagger; heard him talk, and he talked like he always did; that appellant was not drunk at this time.

J. W. Goosby testified for the state that, when he was in the cellar with appellant gambling on the night in question, appellant appeared to be sober. There was nothing wrong with his conduct. Witness did not see or hear appellant say anything out of the way.

W. S. Bowles testified for the state that he saw the appellant on the night of the gambling. He thought that the appellant was drinking some, but he was not drunk.

*Charles E. McPherren, Charles P. Abbott,* and *Sprowls & Crockett,* for appellant.

*Smith C. Matson,* Asst. Atty. Gen., for the State.

FURMAN, P. J.  First.  Much of the transcript of the record of this case is made up of carbon copies on onionskin paper which are so indistinct as to be almost unintelligible. The same is true of the copies of the brief of appellant which have reached this court. It is the duty of counsel to see that the transcript of the record and copies of their brief are typewritten

so plainly that they· can be easily read.    The indistinct manner in which the typewriting was done in much of this record, and also in the brief of counsel for appellant, has forced us to work several days longer on this case than we should have done, trying to find out just what the record contained, and what points counsel for appellant relied upon.    We truly hope that in the future counsel will see that their briefs and records are plainly typewritten.

Second.    When this case was called for trial and after the state had announced ready, counsel for appellant filed the following motion for a continuance:

"In the District Court of Bryan County, State of Oklahoma.    State of Oklahoma, Plaintiff, v. Will Rose, Defendant. Motion for a continuance.    Comes now the defendant, Will Rose, and states that he is charged by indictment in the above-styled cause with the crime of perjury, and that the said cause is set down for trial on this date, and as grounds for this, his motion for a continuance of the said cause to a later date; alleges and states as follows, to-wit:    That heretofore, on the 2d day of January, 1911, the defendant had a subpoena issued for one A. L. Cordell, of Colbert, Okla., and the said subpoena was on said date delivered to the sheriff of Bryan County, Okla., and thereafter duly served on said witness A. L. Cordell at Colbert, Bryan county, Okla.; that the defendant, who now resides at Durant, Bryan county, Okla., had no notice or information to the effect that the said A. L. Cordell would not be in attendance upon this court, until about 10 o'clock a. m. on this date, when the defendant learned from H. N. Roberts, deputy sheriff of Bryan county, Okla., that the wife of the said A. L. Cordell was dangerously ill, and that said Cordell would not probably be in attendance as a witness in this case; that the defendant through his attorneys immediately communicated by telephone with Mr. Arthur Love, the proprietor of a drug store in Colbert, Okla., and learned from Mr. Love that Mr. Cordell's wife was dangerously ill; that said Colbert had stated that he would not be able to get away from home at this time.    The defendant further states that he has used all diligence possible in securing process and having same served on said witness Cordell, and that on Friday, January 6th, the defendant in company· with one of his attorneys, Robert Crockett, saw and talked to the said witness A. L. Cordell, in Colbert, Okla., and that the said Cordell stated that he had been subpoenaed as a witness for the defendant in this case, and that

he would be in attendance upon the court to testify in behalf of the defendant; that the said witness is not absent with the procurement or consent of the defendant. The defendant further states that said witness, A. L. Cordell, was at the time of the occurrence about which defendant testified a constable in the Colbert precinct, and that the said Cordell knew and observed the mental and physical condition of the defendant at the time it is alleged that a certain crap game was played, and that, if the said A. L. Cordell was present as a witness, he would testify in this case as follows, to-wit: That he was constable in the Colbert precinct at the time it is claimed that the defendant and others were engaged in a crap game in a cellar in Colbert, Okla. That he was in company with H. N. Roberts and Milt McPherson. That, after he and Roberts and McPherson had been at the storm cellar some little time, several boys came out of the storm cellar, and among them were Vernon Badgett, Vernon Bell, Ed Goosby, Oscar Askew, Walter Rogers, and Puck Coleman and George Hinson. That these boys stopped near the storm cellar, and that the witness H. N. Roberts, Milt McPherson, and W. S. Bowles were talking to them when the witness saw Will Rose come staggering from toward the said storm cellar. That said Will Rose was very drunk, and talked incoherently. The first thing Rose said was, 'What the ——— are you fellows doing?' He did not talk much, and was unsteady on his feet, and was about as drunk as a man could be and stand up. He did not say anything about gambling or where he had been or where he was going. He did not seem to know what was going on between the officers and the other boys. That the above is material to the defense of the defendant, and that defendant cannot establish same by any other witness. That the same is true. Wherefore the defendant asks the court to continue this case until such time as the said witness can be secured to testify in this cause.

"WILL ROSE.

"Sworn to and subscribed before me this 9th day of January, 1911.

"W. R. COLLINS, District Clerk."

This motion for a continuance was overruled by the trial court, and the appellant was forced into trial, to which action of the court appellant excepted.

There are three reasons why the court did not err in overruling this application for a continuance. The absent witness resided in the town of Colbert, 15 miles from the county seat where court was held. The application for a continuance was

overruled on the morning of January 10th, but the record shows that the examination of witnesses did not begin until the morning of January 11th. If the appellant had really desired the presence of A. L. Cordell, as soon as his absence was discovered, appellant should have applied for an attachment for said witness returnable instanter and the presence of the witness could have been obtained in a few hours, or the fact could have been made to appear by legal evidence that the attendance of the witness could not be obtained. Appellant should have exhausted his legal remedies to secure the absent witness before applying for a continuance. As appellant did not take this course, we are inclined to the opinion that what he wanted was a continuance, and not the testimony of the absent witness. It is nowhere stated in the record that the testimony expected to be proven by this absent witness could not be obtained from some other source. A continuance should not be granted merely for the purpose of obtaining cumulative evidence. There is no pretense that the appellant was drunk when he testified in court, and did not know his testimoney was false when given. We therefore hold that the court did not err in overruling the application for a continuance. Although an application for continuance may be good upon its face, yet, if upon trial it appears that the testimony for which it was sought could not have affected the result of the trial, a conviction will not be reversed upon the ground that the continuance was refused.

Third. The indictment in this case contains 12 counts. Count No. 1 alleges that this defendant was sworn as a witness in the case of State of Oklahoma v. R. Coleman, and thereafter testified, in substance, that on the night H. N. Roberts came upon R. Coleman, Oscar Askew, Will Rose, Walter Rogers, Vernon Bell, Vernon Badgett, George Hinson, and Ed Goosby, he, the said Will Rose, did not see any money that night. It is further alleged that said statement testified to by this defendant in said case at said time was false, and that the said statement was then and there material to the issue in said cause.

Count No. 2 alleges that the said defendant was sworn as a witness in said cause, and thereafter testified, in substance,

that on the night H. N. Roberts came upon R. Coleman, Oscar Askew, Will Rose, Walter Rogers, Vernon Bell, Vernon Badgett, George Hinson, and Ed Goosby, in a storm cellar near Colbert, he, the said Will Rose, was not gambling. It is further alleged that said statement so testified to by this defendant was false and that said statement was then and there material to the issue in said case.

Count No. 3 alleges that this defendant was sworn, as a witness in said cause, and thereafter testified, in substance, that on the night H. N. Roberts came upon R. Coleman, Oscar Askew, Will Rose, Walter Rogers, Vernon Bell, Vernon Badgett, George Hinson, and Ed Goosby in a storm cellar at or near Colbert, he, the said Will Rose, did not see R. Coleman gambling. It is further alleged that such statement so testified to by this defendant was false, and was then and there known to this defendant to be false, and was then and there material to the issues in said cause.

Count No. 4 alleges that this defendant was sworn as a witness in said cause, and thereafter testified, in substance, that on the night when H. N. Roberts came upon R. Coleman, Oscar Askew, Will Rose, Walter Rogers, Vernon Bell, Vernon Badgett, George Hinson, and Ed Goosby in a storm cellar at or near Colbert, Vernon Badgett was not gambling. It is further alleged that said statement so testified to by this defendant was false, and was then and there known to this defendant to be false, and was then and there material to the issues in said cause.

Count No. 5 alleges that this defendant was sworn as a witness in said cause, and thereafter testified, in substance, that on the night H. N. Roberts came upon Oscar Askew, Will Rose, Walter Rogers, Vernon Bell, Vernon Badgett, George Hinson, and Ed Goosby in a storm cellar at or near Colbert, Vernon Bell was not gambling. It is further alleged that such statement so testified to by this defendant was false, and was then and there known to this defendant to be false, and was then and there material to the issues in said cause.

Count No. 6 alleges that this defendant was sworn as a witness in said cause, and thereafter testified, in substance, that

on the night H. N. Roberts came upon Oscar Askew, Will Rose, Walter Rogers, Vernon Bell, Vernon Badgett, George Hinson, and Ed Goosby in a storm cellar at or near Colbert, Ed Goosby was not gambling. It is further alleged that such statement so testified to by this defendant was false, and was then and there known to this defendant to be false, and was then and there material to the issues in said cause.

Count No. 7 alleges that this defendant was sworn as a witness in said cause, and thereafter testified, in substance, that on the night H. N. Roberts came upon the said Oscar Askew, Will Rose, Walter Rogers, Vernon Bell, Vernon Badgett, George Hinson, and Ed Goosby at or near Colbert, the said Vernon Bell was not shooting dice. It is further alleged that such statement so testified to by this defendant was false, and was then and there known to this defendant to be false, and was then and there material to the issues in said cause.

Count No. 8 alleges that this defendant was sworn as a witness in said cause, and thereafter testified, in substance, that on the night H. N. Roberts came upon Oscar Askew, Will Rose, Walter Rogers, Vernon Bell, Vernon Badgett, George Hinson, and Ed Goosby in a storm cellar at or near Colbert, Walter Rogers was not shooting dice. It is further alleged that such statement so testified to by this defendant was false, and was then and there known to this defendant to be false, and was then and there material to the issues in said cause.

Count No. 9 alleges that this defendant was sworn as a witness in said cause, and thereafter testified, in substance, that on the night H. N. Roberts came upon the said Puck Coleman, Oscar Askew, Will Rose, Walter Rogers, Vernon Bell, Vernon Badgett, George Hinson, and Ed Goosby, in a storm cellar at or near Colbert, Puck Coleman was not shooting dice. It is further alleged that such statement so testified to by this defendant was false, and was then and there known to this defendant to be false, and was then and there material to the issues in said cause.

Count No. 10 alleges that this defendant was sworn as a witness in said cause, and thereafter testified, in substance, that

on the night H. N. Roberts came upon R. Coleman, Oscar Askew, Will Rose, Walter Rogers, Vernon Bell, Vernon Badgett, George Hinson, and Ed Goosby in a storm cellar at or near Colbert, George Hinson was not shooting dice. It is further alleged that such statement so testified to by this defendant was false, and was then and there known to this defendant to be false, and was then and there material to the issues in said cause.

Count No. 11 alleges that this defendant was sworn as a witness in said cause, and thereafter testified, in substance, that on the night H. N. Roberts came upon R. Coleman, Oscar Askew, Will Rose, Vernon Bell, Vernon Badgett, George Hinson, and Ed Goosby in a storm cellar at or near Colbert, none of the boys in said cellar were shooting dice for money while he, the said Will Rose, was in said cellar on the night H. N. Roberts came upon the said R. Coleman, Oscar Askew, Will Rose, Vernon Bell, Vernon Badgett, George Hinson, and Ed Goosby. It is further alleged that such statement so testified to by this defendant was false, and was then and there known to this defendant to be false, and was then and there material to the issues in said cause.

Count No. 12 alleges that this defendant was sworn as a witness in said cause, and thereafter testified, in substance, that on the night H. N. Roberts came upon R. Coleman, Will Rose, Oscar Askew, Walter Rogers, Vernon Bell, Vernon Badgett, George Hinson, and Ed Goosby in a storm cellar at or near Colbert, he did not see anybody win or lose money at any gambling game in the presence of said R. Coleman in said storm cellar. It is further alleged that such statement so testified to by this defendant was false, and was then and there known to this defendant to be false, and was then and there material to the issues in said cause.

Upon the trial of this case the court, among other things, instructed the jury as follows:

"(2) You are further instructed that an unqualified statement of a matter which the witness does not know to be true is equivalent to a statement of that which the witness knows to be false, if such statement be made willfully, and is intended that it should be received as a statement of what was true in fact. * *

"(8)   You are further instructed that the fact that the defendant was or might have been intoxicated at the time it is alleged the defendant was in the storm cellar on the night of the alleged crap game may be considered by you for the purpose of determining whether at the time the defendant testified in the case of the State of Oklahoma against R. Coleman he testified to what he really believed to be the truth about what he saw in the storm cellar on said night, and, if you have a reasonable doubt as to whether the defendant testified to the statement alleged in the indictment willfully and corruptly, then you should acquit the defendant.   However, if you believe beyond a reasonable doubt that upon the trial of the case of the State of Oklahoma against R. Coleman, the defendant, Will Rose, having been sworn as alleged in the indictment, then and there under oath, testified to the statements alleged in one or more of the counts in the indictment herein, and that such statement or statements or either or any of them were false, and that he made such statement or statements willfully and corruptly, knowing his statements to be false, or if said defendant at the time of the alleged crap game was in such a state of intoxication that at the time he testified he did not know that the statements which he made in giving his testimony were true or false, if you believe beyond a reasonable doubt that said defendant testified willfully and corruptly and falsely to the statements, in the indictment not knowing whether said statement or statements or either or any of them were true or false with the intent that said statements should be received as a statement of what was true in fact, then you should convict the defendant.

"(9)   You are instructed that a criminal and corrupt intent is a vital element in the crime of perjury.   And therefore it is incumbent upon the state to prove beyond a reasonable doubt that the defendant made the false statement, if you find they were false, willfully—that is with the knowledge on the part of the defendant that he did not know that he was telling the truth— and with the intent that his statement should be received as true in fact, and in this connection the term 'willfully' is used to mean a purpose or intent to commit the act."

Appellant excepted to instruction No. 2 upon the following grounds:

"The defendant excepts to instruction No. 2, wherein the court submits the law relative to the making of an unqualified statement or a matter which the witness does not know to be true, and as being equivalent to a statement of that which the witness knows to be false, for the reason that, under the indictment and

issues in this case and the evidence submitted, the instruction is not proper."

And also to instruction No. 8, as follows:

"The defendant excepts to the latter part of the instruction No. 8, wherein the court instructs the jury that if said defendant at the time of the alleged crap game was in such a state of intoxication that at the time he testified he did not know that the statement which he made in giving his testimony was true or false, 'if you believe beyond a reasonable doubt that said defendant testified willfully and corruptly and falsely to the statements in the indictment, not believing that said statements or either or any of them were true or false, if he intended that said statement should be received as a statement of what was true in fact, then you should convict the defendant.' Defendant excepts to this part of the instruction, for the reason that it submits to the jury an issue not raised by the evidence as charged under the indictment, would not be proper."

In their brief counsel for appellant say:

"It is our contention that, in that the indictment in this case charges that the defendant 'falsely, corruptly, knowingly, willfully and maliciously testified falsely,' and did not charge that the defendant made 'an unqualified statement of that which he did not know to be true, the court erred in refusing to give to the jury requested instructions."

As we understand their position, the contention is that instruction No. 2 is erroneous because the crime of perjury may be committed in two ways: First, by falsely, corruptly, knowingly, willfully, and maliciously testifying falsely; and, second, by making an unqualified statement of that which the witness did not know to be true, and that, because the indictment in this case only charged a willful and corrupt swearing with knowledge of the falsity of the testimony, a conviction could not be had of making willful and unqualified statements of that which the witness did not know to be true. Counsel, however, have not cited a single authority in support of this position. Knowing as we do the learning, ability, and zeal of counsel for appellant, their failure to cite any authority in support of their contention is strongly suggestive of the idea that no such authority exists. Without disrespect to counsel, we think their contention is absolutely want-

ing in merit. Our statute upon the subject of perjury is as follows:

"Section 2176. Perjury defined.—Every person who, having taken an oath that he will testify, declare, depose or certify truly before any competent tribunal, officer, or person, in any of the cases in which such an oath may by law be administered, willfully and contrary to such oath, states any material matter which he knows to be false, is guilty of perjury.

"Sec. 2177. Oath defined.—The term 'oath' as used in the last section, includes an affirmation, and every other mode of attesting the truth of that which is stated, which is authorized by law.

"Sec. 2178. Oath of office.—So much of an oath of office as relates to the future performance of official duties is not such an oath as is intended by the previous sections."

"Sec. 2180. Incompetency of witness no defense.—It is no defense to a prosecution for perjury that the accused was not competent to give the testimony, deposition or certificate of which falsehood is alleged. It is sufficient that he actually was required to give such testimony or made such deposition or certificate.

"Sec. 2181. Materiality of testimony not necessary.—It is no defense to a prosecution for perjury that the accused did not know the materiality of the false statement made by him; or that it did not in fact affect the proceeding in or for which it was made. It is sufficient that it was material, and might have been used to affect such proceeding.

"Sec. 2182. Making depositions.—The making of a deposition or certificate is deemed to be complete, within the provisions of this article, from teh time when it is delivered by the accused to any other persons with the intent that it be uttered or published as true.

"Sec. 2183. False statement.—An unqualified statement of that which one does not know to be true is equivalent to a statement of that which one knows to be false."

Perjury is defined in section 2176. Section 2183 is no part of the definition of perjury. It does not create or define a separate offense, but only prescribes a rule of evidence whereby the crime of perjury might be established. The same contention on principle was raised by counsel in the case of *Berry et al. v. State,* 4 Okla. Cr. 202, 111 Pac. 676, 31 L. R. A. (N. S.) 849. That was a case of larceny, but the principle involved is the same as in this

case, and in that case, in a very able opinion by Judge Richardson, this court held that upon an information drawn under section 2591, Comp. Laws 1909, defining larceny generally, a conviction may be held upon proof, made as provided in section 2592, that the accused found lost property under circumstances which gave him means of inquiry as to the owner thereof, and that he appropriated the same to his own use without making a reasonable effort to discover the owner and restore the property; the latter section not creating or defining a separate offense, but only prescribing a rule of evidence. We think that the reasoning in the case of *Berry et al. v. State* is conclusive of this case. Judge Richardson there said:

"Snyder's Comp. Laws of Okla. defines 'larceny' as follows: Section 2591. Larceny is the taking of personal property accomplished by fraud or stealth, and with intent to deprive another thereof.' 'Sec. 2592. One who finds lost property under circumstances which give him knowledge or means of inquiry as to the true owner, and who appropriates such property to his own use, or to the use of another person, who is not entitled thereto, without having first made such effort to find the owner and restore the property to him as the circumstances render reasonable and just, is guilty of larceny.' It is urged that each of these sections defines a different offense; and that upon an information drawn under section 2591, charging that the defendant did take, steal, and carry away certain personal property of another with the intent to convert the same to his own use and to deprive such other thereof, a conviction cannot be had upon proof that the defendant found lost property under circumstances which gave him means of inquiry as to the true owner, and appropriated the same to his own use without first making an effort to find the owner and restore the property; the contention being that, where such offense is intended to be charged, the information should specifically set forth the facts enumerated in the latter section. With this contention we cannot agree. We think that section 2591 is the statutory definition of larceny, and that section 2592 only prescribes a state of facts, which, being proved, establishes the offense as defined by the previous section; that it merely enunciates one rule of evidence, a compliance with which proves the crime as previously defined. To constitute larceny, there must be a taking of personal property. It must be done by fraud or stealth, and with a larcenous intent; and these requisites are all present when the facts enumerated in section 2592 exist. The

taking is shown when it is proved that the defendant found lost property, and took it into his possession. If the evidence shows that he knew to whom the property belonged, or that the circumstances gave him means of inquiry as to the true owner, and he made no reasonable effort to find the owner and restore the property, but, on the other hand, concealed the fact that he had found it, the taking is then deemed to have been done by stealth. And, when it is further shown that under such circumstances he appropriated the property to his own use or to the use of any other person not entitled thereto, his larcenous intent is established."

This court has already practically decided the question now presented, in the case of *Pilgrim v. State,* 3 Okla. Cr. 49, 104 Pac. 383. Judge Doyle, in a well-considered opinion, speaking for the court, said:

"Section 2081, Wilson's Rev. & Ann. St. 1903, which declares that 'an unqualified statement of that which one does not know to be true is equivalent to a statement of that which one knows to be false,' should be construed with section 2074, Wilson's Rev. & Ann. St. 1903, which provides that: 'Every person who, having taken an oath that he will testify, declare, depose or certify truly before any competent tribunal, officer, or person, in any of the cases in which such an oath may by law be administered, willfully and contrary to such oath, states any material matter which he knows to be false, is guilty of perjury.' "

And, after citing a number of authorities, Judge Doyle proceeds as follows:

"All of which hold in substance that one can be convicted of perjury only where the false testimony was given corruptly, with knowledge of its falsity, and that it is not enough that the defendant in a perjury prosecution testified positively to that which he did not know to be true."

The distinctions made by Judge Doyle, and to which we still adhere, are clearly recognized and laid down in the instructions of the court in this case, because the jury were informed that they must believe beyond a reasonable doubt that the statements of appellant were willfully and corruptly false and made with the intent that said statements should be received by the jury as true before they could convict appellant, and paragraph 9 of the instructions of the court again repeated the same principle, and informed the jury that a criminal and corrupt intent was a vital element in the crime of perjury.

The Supreme Court of California has so construed these identical sections in *People v. Buelna,* 81 Cal. 135, 22 Pac. 396. The syllabus of that case is as follows:

"Section 485 of the Penal Code, declaring it larceny for one who finds lost property under circumstances which give him knowledge or means of inquiry as to the true owner to appropriate such property to his own use, etc., does not create a distinct kind of larceny, but declares a rule of evidence which, being fulfilled, constitutes the crime as defined in section 484 of the Penal Code; and it is proper to instruct the jury as to such rule of evidence under an information drawn under section 484 defining larceny in general, if the evidence tends to show an unlawful appropriation by the finder of lost property as described in section 485."

In many states where the statutes only define larceny generally as is done in section 2591, Comp. Laws 1909, and where there appears to be no such statute as section 2592, it is nevertheless held that proof of the facts enumerated in the latter section establishes the crime as defined by the general statute. *Flemister v. State,* 121 Ga. 146, 48 S. E. 910; *State v. Weston,* 9 Conn. 527, 25 Am. Dec. 46; *People v. McGarren,* 17 Wend. (N. Y.) 460; *Brooks v. State,* 35 Ohio St. 46. And in *State v. Boyd,* 36 Minn. 538, 32 N. W. 780, it is stated that this was true at common law. Minnesota, however, had a statute similar to section 2592. And in all the cases in the books involving the larceny of lost property we have found none in which the opinion or statement of facts indicated that the indictment alleged the finding, etc., and none holding that such allegations were necessary. See cases cited above; also, *United States v. Pearl,* Fed. Cas. No. 16,022, 5 Cranch C. C. 392; *State v. Bolander,* 71 Iowa, 706, 29 N. W. 602; *State v. Hayes,* 98 Iowa, 619, 67 N. W. 673, 37 L. R. A. 116, 60 Am. St. Rep. 219; *Comm. v. Titus,* 116 Mass. 42, 17 Am. Rep. 138.

The motion to direct a verdict of not guilty was properly overruled.

What has been said with reference to paragraph 2 of the instructions given applies with equal force to the objections to paragraph 8 of the charge as given, and therefore need not be repeated.

Counsel requested a number of special instructions, but as they were all converse to those contained in the second and eighth paragraphs of the court's charge, and as we hold that the instructions given are correct, it is not necessary to point out the errors contained in the instructions which were requested and refused by the court.

Fourth.. There is no contention on the part of counsel for appellant that the testimony given by him in the Coleman trial was true. In fact, this record discloses beyond peradventure of a doubt that it was absolutely false. There was but one question for the trial court to determine—that the defendant knew that it was false at the time he testified. Upon this question, also, there can be no doubt, because those who were with him in the storm cellar that night testify that he was not drunk; that he talked as rational as he ever did; that he was gambling there and knew what was going on and was in every respect rational so far as they were able to determine. This is the testimony, also, of the officers who saw him. The record discloses that at the time thi raid was made Rose was smart enough to remain in the storm cellar unobserved by the officers, and thereby escape arrest. So that it appears conclusively, not only from the testimony of the witnesses who saw him on that occasion, but from his actions and conduct, that he knew exactly what he was doing, and was smart and adroit enough to escape arrest for the offense that he had committed.

Owing to the dangerous character of the offense of perjury and the frequency with which it is committed in the state of Oklahoma, and for the purpose of urging the officers of this state to be vigilant in the future in the prosecution of such cases, we will repeat here what we said with reference to perjury in the case of *Coleman v. State*, 6 Okla. Cr. 283, 118 Pac. 607, as follows:

"Next to the crime of seduction and rape, perjury is the most serious offense against the laws of the state, and the most infamous in its character that can be committed, and especially the kind of perjury for the commission of which appellant now stands convicted. We can have some respect for a man who for a reason or fancied wrong enters into a fair combat in which he takes the life of his adversary. We can even sympathize with an aged widowed mother or a devoted wife, sister, or daughter, who,

through love for a son, a husband, or brother, or a father, is driven to the commission of perjury to save such loved one from the hangman's noose. We can understand how perjury in cases of this kind may not indicate an utter want of moral character, but we cannot find language strong enough to express our detestation of the crime for which appellant has been convicted. The smallness of the cause for which perjury is committed is a true indication of the moral depravity of the man who commits it. The fact that the jury did not give appellant the full limit of the law is the only thing about this case worthy of criticism. We think that the smaller the inducement for perjury the greater the punishment should be. The man who will commit perjury to shield a crap shooter or a bootlegger is a most dangerous man to society. The longer he can be locked up the better it will be for the interests of public justice. From the record which we have examined in bootlegging and gambling cases, we are impressed with the idea that this kind of offense is common in this state. In fact, it appears that these cases are largely schools for perjury. The county attorneys and judges and grand and petit juries of the state cannot be too diligent in bringing such parties to justice. There is too much of a disposition to look upon perjury in these cases as something to be expected, and as being of but small importance. Men who perjure themselves in these small cases will not hesitate, if an inducement is offered, to perjure themselves in order that they may cheat the gallows of its due or consign innocence to a felon's cell, or rob widows and orphans of their property. Perjury attacks the integrity of all legal proceedings, and thereby endangers the institutions of our country; and we again call on county attorneys and all other officers to exercise the utmost diligence in prosecuting these offenders, with the assurance that, when they are fairly tried and proven to be guilty, this court will not hesitate to do its full duty in each case. No class of offenders should be more vigorously and relentlessly prosecuted or severely punished. County attorneys are requested to urge these views upon juries in all perjury prosecutions. Let all unite in a determined effort to make perjury dangerous even in the smallest cases. When this is done, there will be more respect for law, and not so many miscarriages of justice in our courts."

We find no error in the record. The evidence clearly establishes the guilt of appellant. The judgment of the lower court is therefore in all things affirmed.

DOYLE, J., concurs; ARMSTRONG, J., absent, and not participating.