## H. M. ELLIOTT v. STATE.

No. A-3040—Opinion Filed Aug. 28, 1920.

Rehearing Denied Jan. 15, 1921.

(194 Pac. 267.)

(Syllabus.)

1. **HOMICIDE—Dying Declarations—Admissibility.** Whether or not a purported dying declaration was made by a deceased under the sense of impending death is, first, solely a question for

the trial court, in so far as it determines the admissibility of the declaration. In order to be admissible in evidence, it must sufficiently appear by evidence adduced on the preliminary hearing, had in the absence of the jury, that such declaration was made at a time that the deceased was under a sense of impending death, and that the declaration is restricted to facts concerning the facts and circumstances attending the homicide being tried, and, such facts being established, such declaration should be admitted in evidence, notwithstanding that subsequent to making such declaration the deceased expressed the belief that he would get well. It is not necessary that the deceased declare that he is going to die. It is sufficient if the circumstances, including his physical condition, and that he was too weak to sign his name to the declaration and so affixed his mark thereto, and that he four days after making such declaration died from the infliction of the wound to which said declaration relates, show that at the time of making such declaration he believed he was going to die, and renders said purported dying declaration admissible in evidence.

2. **HOMICIDE—Self-Defense—Evidence of Decedent's Acts of Violence.** Where, in a homicide case, self-defense is pleaded, and there is evidence to support same, specific acts of violence on the part of the deceased may, if known to the defendant prior to the homicide, be shown in evidence.

3. **SAME—Acts of Violence Unknown to Accused.** Before evidence of specific acts of violence on the part of the deceased toward third persons, in a homicide case where self-defense is pleaded, is competent, a predicate must be laid by offering to show by the defendant that he had knowledge of such specific acts prior to the commission of the homicide. Where no such showing is made, and the entire defense of self-defense is based upon the acts and conduct of the deceased at the time the homicide was committed, the alleged error of the trial court in excluding evidence of specific acts of violence toward other persons is not prejudicially erroneous.

4. **HOMICIDE—Harmless Error—Instructions and Exclusion of Evidence.** Where defendant is convicted of manslaughter in the first degree, and under his own testimony he is at least guilty of that degree of felonious homicide, alleged errors of the trial court in excluding evidence or in giving or refusing to give instructions will not be considered prejudicial.

*Appeal from District Court, Murray County;*

*F. B. Swank, Judge.*

H. M. Elliott was convicted of manslaughter in the first degree, and he appeals. Affirmed.

*Broadbent & Rawlings,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *R. McMillan,* Asst. Atty. Gen., for the State.

ARMSTRONG, J. The plaintiff in error, H. M. Elliott, hereinafter designated as defendant, was informed against for the murder of C. M. Taylor, convicted of manslaughter in the first degree, and sentenced to imprisonment in the penitentiary at McAlester for a term of four years. To reverse the judgment rendered on the verdict he prosecutes this appeal.

The evidence tended to show that the deceased was a man about 30 or 35 years old; weighed about 170 or 180 pounds; that for two years prior to the homicide the deceased and the defendant were near neighbors, and there was a tract of 20 acres adjacent to the lands of the deceased and defendant, upon which there was a house used by the defendant as a granary and in which he had stored 200 or 300 bushels of grain, and which said 20 acres of land was used by the deceased and by the defendant as a pasture, of which tract the defendant claimed to have control, and around which said pasture there was little or no fence; that on the day of the homicide the defendant drove to Sulphur, and at the request of the sister-in-law of the deceased took a jug and brought back some coal oil for her, which jug of oil on his return he delivered to deceased, and deceased engaged defendant in a quarrel; that the defendant went to his home and shortly thereafter drove his wagon to near the house in said 20-acre tract, and deceased came up to where defendant was and a dispute ensued between deceased and

defendant, and defendant while in his wagon shot deceased with a 44 Colt's, from the effect of the said wound deceased a few days thereafter died.

The state, preliminary to offering in evidence a claimed dying statement of deceased, introduced voluminous evidence that at the time he made said statement he was under the impression of impending death; that said statement was read over to deceased, approved by him as correct, and executed by him in the presence of the witnesses, who signed the statement as witnesses to the execution thereof; together with proof that he was unable to write, and executed the paper by his mark. There was evidence on the part of defendant that tended to show that after making said statement the deceased expressed the opinion that he would get well; that the shot would not kill him.

The said statement was then offered by the state in evidence, and reads as follows:

"I, C. M. Taylor, realizing that I am about to die, and am fatally wounded, make this statement: H. M. Elliott shot me with a six-shooter. We had trouble over some stock. I met him in the field. He had been running my mules in the pasture about 20 minutes and I went up there. I asked him what he was going to do, and he said he was going to turn the stock out, and I told him he would have to kill me first, and he said he would damn sure turn them out, pulled his six-shooter, and shot me. He was on a wagon and I was afoot. I was not armed; didn't even have a pocketknife. I was two or three feet from the back of the wagon and he was in the front end. I had not threatened him. Jim Elliott was about 80 yards away. No one was present. Elliott was on horse running the stock, but when he saw me coming he got in the wagon. Two or three hours before I talked to Elliott

at my house that I had turned Jones' stock out and to tell him, so he could get them up. When I came up Elliott got off his horse and left it with Jim Elliott, and went to the wagon. Mr. Elliott and I had no trouble before.

his

"C. M. X Taylor.

mark

"Witness to statement, also to mark of C. M. Taylor:

"E. E. Vaughn.

"E. P. Nelson.

"H. M. Banning, D. D. S."

Defendant objected to the introduction of said statement in evidence as the dying declaration of deceased, upon the ground that a proper predicate had not been laid for the introduction of the same. The court overruled said objection, admitted said statement as the dying declarations of the deceased, and defendant excepted.

The defendant first insists that the court committed reversible error in admitting in evidence as the dying declarations of the deceased the statement admitted in evidence, for the reason that a proper predicate was not laid for the admission of the same; and with this contention we do not agree. The voluminous evidence that was introduced in the preliminary examination as to the admission of said paper shows that at the time said statement was made by the deceased he was under the belief of impending death, as to which his physical condition at the time and his early death thereafter from the wound inflicted by the defendant lends additional weight to the direct statement made by him in said statement "that he made said statement under the impression that his death was impending." That he subsequent

to making said statement expressed the opinion that he would get well did not render said statement inadmissible, as it was the duty of the court to take all the evidence offered in order to determine the state of mind of the defendant at the time of making said statement; and, so doing, we think it sufficiently appears that when the said statement was made the deceased believed he was about to die, and that therefore the court did not err in admitting said statement in evidence as the dying declarations of the deceased.

In *Hawkins v. United States,* 3 Okla. Cr. 651, 108 Pac. 561, it is held:

"Whether a purported dying declaration was made under a sense of impending death is a question solely for the court in so far as it determines the admissibility of the declaration in evidence."

In *Morris v. State,* 6 Okla. Cr. 29, 115 Pac. 1030, Judge Doyle, speaking for the court, says:

"It is sufficient if it satisfactorily appears that they were made under the sense of impending death, whether it be directly proven by the express language of the declarant, or be inferred from his evident danger, or the opinions of the medical attendants, stated to him, or from other circumstances of the case, such as the length of time elapsing between the making of the declaration and his death, and the fact that the declarant was so weak that he could not sign his name and so affixed his mark, all of which are resorted to, in order to ascertain the state of declarant's mind."

Defendant testified, in substance, that he and deceased lived on adjoining farms; that he was a man about 41 years of age, weighing about 127 pounds, and that the deceased was a man about 28 years of age,

about six feet tall, and weighed about 180 pounds; that defendant and the brother of deceased had a joint pasture, composed of about 20 acres of stubble controlled by defendant and about 80 acres of grazing land, with running water, controlled by the brother of deceased; that on the 20-acre tract there was an old house, which was being used by, defendant as a granary, in which at the time he had stored some feterita; that on Saturday, the day of the tragedy, defendant had gone to the town of Sulphur and had got a jug of coal oil for Mrs. Taylor, the sister-in-law of deceased and had brought the same back to her; that deceased came out to the wagon of defendant and got the coal oil, and at that time told defendant that he (deceased) had turned Hess Jones' stock out of the pasture and deceased wanted to know who in the hell turned them in there, and defendant told him he did, and deceased told defendant that he wanted him to understand, by God, not to turn any more stock in there, that, if defendant did, it would be the last time that he would ever turn any in, and defendant told deceased he thought he had a right to turn stock in, and deceased then commenced cursing and stepped up to the wagon, stepped upon the back of the wagon, and started at him and said, "I will stamp you through the wagon, you God damned son of a bitch;" that thereupon defendant started up and drove off, and deceased stepped off of the wagon, being in a very angry mood.

Defendant then went home, fed his team, hitched up his wagon, got a hammer and some nails, and went over to the house in the pasture where the feterita was stored to fix up the door, after getting a 44 loaded Colt's revolver, which he carried along with him; that while he

was down at the house fixing the door his son, Jim Elliott, came home on horseback and came down to the house, defendant having told his wife while at home that he wanted the horse to ride over east to pay for some threshing that he had had done; that after his son, Jim, came down to the house, he told him about the trouble he had had with Charley Taylor, and they decided then to drive all strange stock out of the pasture in order, as defendant testified, to avoid any further trouble with Taylor; and that Jim Elliott then started to drive a pony belonging to Hugh Garrett out of the pasture, and the pony got mixed up with some mules belonging to deceased, and while chasing the pony Jim Elliott also chased the mules some, and deceased started down towards where defendant and his son were. Whereupon Jim Elliott rode up to where his father was and told defendant that the deceased was coming and that he had better go home, and defendant thereupon got in his wagon and started home and deceased holloed at him, threw up his hands, and told defendant to wait, and defendant thereupon stopped his wagon and waited for deceased to come up, and deceased then asked defendant what in hell he was doing running his mules, and defendant replied that he was not running the mules but was just trying to get Hugh Garrett's pony out, and deceased then said, "You are a God damned lying son of a bitch; you were running my mules;" and deceased started for the wagon and defendant told him to stand back, he did not want to have any trouble with him. Deceased then stepped up to the side of the wagon and said, "It had just as well come off now as any time;" and defendant again said, "Stand back; I don't want to have any trouble with you." Deceased then whirled around

to the end of the wagon where the end-gate was out, and started to come over the end of the wagon towards defendant, saying, "You God damned son of a bitch, I will kill you;" at which time deceased had his right hand in his right pants pocket and his left hand on the end of the wagon. Defendant then picked up his gun, which was lying on a sack of chops in the end of the wagon, and told deceased to stop, and deceased then told defendant to "shoot, you God damned cowardly son of a bitch"; that defendant was afraid of deceased; that deceased did not stop and defendant shot, and deceased swung down off of the wagon and fell backwards and said, "Why didn't you finish me, you God damned son of a bitch; if I had got to you first I would have finished you;" that defendant did not see any weapon or other thing in the hands of the deceased when he shot him; that after defendant had shot deceased defendant drove the wagon off a little ways and waited until Mrs. Taylor, the sister-in-law of deceased, came out, defendant having sent his son, Jim, after her; that in about five minutes Mrs. Taylor came up, and defendant told her he had to shoot Charley, that he tried to shoot him in the legs enough to stop him, and Mrs. Taylor told defendant that she begged and cried with that fellow to keep him from coming up there and trying to start anything; that after Mrs. Taylor got up to the scene defendant left and went to E. T. Nelson's and asked Nelson to help carry deceased home; that Jim Elliott was present when the shooting occurred.

Defendant also testified that it was about an hour from the time he had had the first difficulty with deceased until he shot deceased; that he did not have the gun with

him on the first occasion; that he never threatened deceased, or pointed the gun at him, until deceased tried to get into the wagon; that the granary was in sight of the house in which deceased lived; that he did not tell his son to chase the stock for the purpose of provoking trouble with deceased.

Defendant offered to prove by one G. W. Davidson that the said witness had seen "violent outbursts of temper without provocation" on the part of the deceased, and that the same was known to defendant at the time of the tragedy. Upon objection by counsel for the state, the court refused to permit such evidence to be admitted, and defendant excepted thereto. It is contended that this ruling of the trial court was erroneous.

With this contention we cannot agree, for the following reasons: (1) The evidence was objectionable because it called for the opinion of the witness as to what were "violent outbursts of temper without provocation;" (2) the offer was not specific enough to prove any particular acts of violence on the part of deceased which were known to defendant prior to the commission of the tragedy.

Later in the examination of witness Davidson, counsel for the defendant, made the following offer:

"Comes now the defendant and offers to prove by the witness A. L. Morris that the deceased was a man of violent and turbulent character; that deceased had, a short time previous to this tragedy talked to said witness, who was a boy of about 120 pounds weight, while deceased weighed about 175 pounds; that he attacked him over a frivolous unimportant matter; that the deceased flew into a violent and unreasonable rage; and forced this

witness to leave his home to save himself; all of which was known to the defendant at the time of the tragedy."

The trial court denied that part of the offer relative to the previous attack over "a frivolous matter," to which action counsel for the defendant at the time excepted. It is also contended that this was error.

So far as this record shows, the witness A. L. Morris was never sworn and offered in behalf of the defendant for any purpose, so that no questions were ever propounded to him relative to any specific acts of violence by the deceased toward him, prior to the alleged homicide, which were known to the defendant. The offer was also objectionable, in that, had such a witness been offered, it called for the conclusion of the witness as to the merits of the controversy, in that it was over "a frivolous unimportant matter."

While this court has heretofore held (*Mulkey v. State*, 5 Okla. Cr. 75, 113 Pac. 532; *Mathews v. State*, 16 Okla. Cr. 466, 184 Pac. 468), that where the plea of self-defense is interposed, and there is evidence to sustain the same, specific acts of violence known to the defendant anterior to the homicide may legally be given in evidence, there must, as a predicate, be a clear showing, before such evidence becomes admissible, that the defendant had knowledge of these specific acts of violence on the part of the deceased prior to the commission of the homicide, and also a reasonable showing that the defendant acts in his own necessary self-defense. At the time these offers were made, nor at any subsequent stage of the trial, was there such a predicate laid in this case.

While the court gave an incorrect reason for exclud-

ing this evidence, this court is not bound by the reason given by the trial court, but if for other reasons the evidence should have been excluded the action of the trial court in excluding the same will not constitute reversible error.

An examination of the record discloses that, although the defendant took the witness stand in his own behalf, he did not claim, nor was there any offer to prove by him that he had any knowledge that the deceased had, prior to the commission of the homicide, committed any acts of violence whatever on any other persons. His entire defense is based upon the acts and conduct of the deceased at the time the homicide was committed. No other element than such acts and conduct is claimed by the defendant to have entered into his apprehension of danger. If the deceased had been guilty of specific acts of violence toward other persons prior to the time defendant claimed he was about to assault him, and these specific instances were known to the defendant, in order to make it clearly appear that this evidence was competent and that the defendant was injured by its exclusion, the defendant should have been asked relative to his knowledge of the same. A disconnected offer to prove that the defendant knew of any specific acts of violence to others, without propounding the proper questions to defendant himself as a predicate for such evidence, does not make a record that discloses that any prejudice resulted to defendant by the exclusion of this testimony, and the burden, under the criminal procedure of this state, is upon defendant in the appellate court to clearly establish that the alleged error of the trial court in excluding evidence probably resulted in a miscarriage of justice, or else deprived

defendant of some constitutional or statutory right.  Section 6005, Revised Laws 1910.

Further, we are of opinion that the testimony of defendant does not entitle him to an acquittal upon the ground of self-defense, but, under the most favorable view that may be taken of his testimony, he is at least guilty of manslaughter in the first degree, of which crime he was convicted.  About one hour previous to the commission of the homicide defendant and deceased had had a difficulty, the circumstances of which were almost identical with the occurrences at the time of the shooting.  On the first occasion defendant was not armed, and while deceased, according to defendant's testimony, was clearly the aggressor and attempted to climb into the wagon and assault defendant, defendant on that occasion was able to avoid trouble by merely driving away; deceased jumping off the wagon without pursuing defendant or attacking him in any manner.

After this happening defendant drove to his house, procured a loaded 44-caliber revolver, and again went to a place where he had reason to believe that deceased would see him.  Defendant directed his son to drive certain stock out of the pasture, and in driving this stock defendant's son also chased some stock of deceased—an act which was clearly calculated to again arouse the anger of deceased, as defendant must have known.

When deceased approached defendant on this latter occasion defendant was not in his wagon, but he immediately got into his wagon, where his pistol was located, and when deceased approached him and cursed him and bantered defendant to shoot, defendant did not drive away

as he had done on the first occasion, but complied with the deceased's request and shot him, and at the time defendant shot deceased, according to defendant's own testimony, he saw no weapons in the hands of deceased and deceased was doing nothing more than he had previously done, that is, to climb into the back end of the wagon, with his right hand in his front pants pocket, and defendant, without waiting for further demonstrations upon the part of deceased, and at a time when defendant had no real reason to believe that deceased intended to assault him with any dangerous or deadly weapon, shot the deceased with a 44-caliber Colt's revolver.

While it is apparent that deceased was not wholly without blame, neither can it be truthfully said that defendant was entirely blameless, according to his own testimony. Deceased at the time of the killing was unarmed, was in his shirt sleeves and wearing his work clothes; and while he was a larger, and perhaps stronger, man than defendant, there is no evidence, according to defendant's testimony, that deceased intended to make a deadly assault upon him or to do him any great or serious bodily harm.

The taking of human life can only be justified on the ground of self-defense when the danger to defendant, either real or apparent, is imminent, and in this case, viewing the circumstances from defendant's own standpoint, we are of the opinion that his own testimony does not support the conclusion that he was justified in shooting deceased with a 44-caliber Colt's revolver on this occasion. He and deceased had been on friendly terms. They were neighbors. Deceased had been to the home of defendant and had helped nurse several members of

the family of defendant during spells of serious sickness, and while defendant might have known that deceased was high-tempered, he at least also knew that not more than an hour previous to this difficulty he had been able to avoid any serious attack by deceased by merely driving away and leaving deceased alone.

The fact that after the first difficulty defendant armed himself with a deadly weapon, and went to a place where he knew deceased was likely to see him, was uncalled for and did not show a disposition on the part of defendant to avoid a serious encounter with deceased. When deceased bantered defendant to shoot, defendant shot, and, according to the testimony of defendant, deceased at that time was not in any position to have caused the defendant any serious bodily injury. While it may be said that defendant is not required to measure to a nicety the danger that appears to him to be imminent, or the force necessary to repel an attack, yet defendant is required, under the law of self-defense, to introduce evidence that tends to create a reasonable doubt that he acted in his own necessary self-defense. The burden is upon defendant to adduce some evidence reasonably tending to support this defense, and if upon an examination of the entire record it appears to this court that defendant was not prejudiced by the exclusion of evidence which would, under some circumstances, be competent where the plea of self-defense is interposed, a judgment of conviction will not be reversed because of the exclusion of such evidence, unless it clearly appears that the error resulted in a miscarriage of justice or deprived the defendant of some constitutional or statutory right. After a careful consideration of the record in this case, and for

the reasons stated, we cannot say that the trial court's action in this respect was prejudicial.

Certain other alleged errors, relative to the instructions given and the refusal to give certain instructions requested by the defendant, are advanced as grounds for reversal.

We deem it a sufficient answer to these contentions to say that after a careful consideration of the facts in evidence the testimony is susceptible of only two conclusions: (1) That of the state makes out a clear case of murder; (2) under the testimony of the defendant, he is, we think, at least guilty of manslaughter in the first degree. To hold that the testimony of the defendant establishes the defense of justifiable homicide would overturn all well-settled rules and statutes pointing out the duty of one engaged in a quarrel to avoid the necessity of a deadly attack when in his power to do so, and at most to use only such force as was reasonably necessary to prevent serious injury to himself.

Under the facts in this case, there is no reason to believe that upon a second trial an intelligent and honest jury could arrive at any other verdict than that of the guilt of the accused. Under such circumstances, it would be a travesty upon justice to reverse this judgment upon technical grounds which tended in no way to prejudice the substantial rights of the defendant.

For the reasons stated, the judgment of conviction is affirmed.

DOYLE, P. J., and MATSON J., concur.