## BOSS FISK v. STATE.

No. A-9190. Sept. 2, 1937.
(71 Pac. 2d 499.)

J. J. Smith, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for the State.

DOYLE, J. This appeal is prosecuted from a judgment of the district court of Ottawa county, wherein the defendant, Boss Fisk, was convicted and sentenced to serve a term of four years in the state penitentiary for the crime of manslaughter in the first degree.

It was the theory of the state that this killing was a deliberate murder, wholly without justification.

The salient facts as shown by the testimony, briefly stated, are as follows:

On the night of September 1, 1935, Boss Fisk shot and killed Jimmie England, in front of a night club and dance hall, operated by Jack Boydstun, about one-half mile north of the town of Commerce.

On the night of the killing, about 8 o'clock, the defendant Fisk and Guyman Martin left the town of Picher in a car with Mrs. Lucille Reynolds and Miss Bernice Gamble, who lived at Commerce, intending to go to Miami, where Mr. C. F. Reynolds, husband of Mrs. Reynolds, was employed. The party drove towards Miami, passing Boydstun's night club, and stopped at Commerce; there the defendant's pistol was pawned; the party then returned to Boydstun's night club, where from the car they ordered

drinks. About that time three or four men, members of a carnival crew from Miami, came out of the night club; one of the men attempted to help himself to one of the drinks ordered by the Fisk party; this started a fight in which Fisk's face was bruised and his shirt torn; Boydstun and his employees stopped the fight and the carnival crew drove off in their car; the Fisk party then returned to Commerce, Mrs. Reynolds driving the car. The defendant's pistol, which had previously been pawned, was redeemed, and the defendant placed it in the pocket on the dash of the car; then the party returned to the night club. Fisk, the defendant, Martin, Mrs. Reynolds, and Miss Gamble left the car and went into the club. At this time Jimmie England was in the night club. Neither Jimmie England nor the defendant were armed, Fisk having left his gun in the car; both were in their shirt sleeves. Jack Boydstun persuaded Fisk to leave "because a part of the sleeve of his shirt was torn off and he was not in no shape to be there." Fisk and his party left the place and went to their car. Jimmie England was still inside; he had caused no trouble. Boydstun walked out with Fisk and was followed by several persons, including Jimmie England; Fisk was standing by the side of the car; Boydstun talked to him and asked him to get in the car and leave; the defendant stepped in the car and then, getting out, remarked: "Who is going to tell me to leave here?" The other members of Fisk's party were in the car. Boydstun then turned and started back to the house; England had followed Boydstun, and was standing a short distance behind him; he was in his shirt sleeves and had on no gun; Boydstun had been standing about ten feet from the defendant during this conversation.

According to the testimony of the state's witnesses, Everett Sykes, Ralph Steiner, Morris Pheebus, Roy Jamie-

son, and John Boydstun, Jimmie England continued to stand still with his hands at his side, about fifteen feet from the defendant, and said nothing. The defendant looked at England, raised his left hand up to the cut on his face received during the difficulty with the carnival men, and said: "Did you cut me?" or "Did you do this?" England made no reply and continued standing as before. The defendant began shooting. At the first shot England grabbed his abdomen and began to fall. The defendant continued to shoot rapidly, firing six shots, and snapping the gun several times thereafter.

After the shooting, Roy Jamieson knocked the defendant down and with the assistance of Morris Pheebus took the gun away from him, then took him into the clubhouse, where he remained until the arrival of the officers. Just after taking the gun from him the defendant said to Jamieson: "It is a good thing I ran out of shells or I would have killed you too." Three witnesses testified that after taking the defendant into the building the defendant stated he wanted to kill him and was glad he did kill him.

It was the uncontradicted testimony of the state's witnesses that the deceased was unarmed.

From the testimony of the undertaker and the attending physician, it appears that all six bullets struck the deceased; one bullet entered the abdomen passing through the spine, one the right shoulder, one the left shoulder, one the right thigh, one the left hip, and one the knee.

The deceased had no weapon of any kind. It appears that several persons standing on the porch walked over to where he fell. He said to them, "I would like to live

but I can't," then became unconscious, and remained so until he died a few hours later.

The defendant admits the killing, but claims that he acted in his own necessary self-defense.

As a witness in his own behalf he testified: That he lived at Picher, and had worked for Mr. Walker for the past four or five years in the tap room and drug store: that he had known Jimmie England for the past five or six years; that he was standing in front of the place he worked talking to Guyman Martin. Mrs. Reynolds and Miss Gamble came by in a car, stopped, and called Martin over to the car. Martin then asked him if he wanted to go with them; they were driving around; he said we were going over to a night club and got in the car; it was then somewhere about 7 o'clock; that they drove around a while and stopped at Jack Boydstun's night club, and ordered some drinks, which were brought out to the car on a tray; that some guy came up and took one of the drinks, and he told him to put it down, it was not his; the man hit him in the face and kept on hitting him and they tore his shirt off; that Jack Boydstun came out and drove them away, and his party drove into Commerce and shortly after returned to Boydstun's place, parked the car, and went in; that with Mrs. Reynolds he went into the dance hall, looked around, then came back into the bar room, and there saw Jimmie England at the far end of the bar; that he said to Mrs. Reynolds, "There is Jimmie England and I am liable to have trouble with him"; that with Mrs. Reynolds, he went out and got in the car, and took his pistol out of the dashboard pocket because Jimmie England had followed him. England said, "Wait a minute, I want you," and was walking towards him. England put his hand back, and he shot him, firing six times as fast as he could; that he thought England was going to

draw a gun; that after the last shot was fired Roy Jamieson ran up and struck him on the head; that the next thing he knew he was walking in the door; that he waited there for the officers to come and get him; that he had a previous difficulty with Jimmie England five or six months before; that England came in where he was employed and kicked the wall in. He said, "Jimmie, what do you mean by tearing up this wall and kicking the place in?" England said, "Go to hell, I will kick you in," and he shot him in the hip. After this difficulty several persons told him that Jimmie England had made threats against him, saying that he was going to kill him, and he secured a permit from the mayor to carry a gun; that he knew Jimmie England's reputation in that community as to being a turbulent man and a dangerous character and it was bad.

On cross-examination he stated he was carrying the gun for Jimmie England, but didn't have it with him there when he had trouble with the carnival men; that his gun had been pledged at McCall's place in Commerce that evening, but before returning to Boydstun's place from Commerce, Miss Gamble redeemed the gun, and he placed it in the dashboard pocket of the car.

The eyewitnesses for the defendant, Mrs. Reynolds and Guyman Martin, testified that the deceased put his hand back to his hip; that when he did this the defendant fired the shots that killed him.

Several witnesses testified to having heard the deceased make threats against the defendant.

A number of witnesses testified that the general reputation of the deceased was that of being a quarrelsome man, and further testified to particular instances of violent and quarrelsome conduct on the part of the deceased.

A number of witnesses asked if they knew the general reputation of the defendant in the community in which he lived as to being a quiet, peaceable, law-abiding citizen, or otherwise, answered that they did; and asked if it was good or bad, they replied good.

In support of the contention of counsel that the judgment should be reversed, numerous errors are assigned, only three of which are argued.

The first is that the verdict is contrary to the law and the evidence.

Upon the whole case we think, after a careful survey of the facts in evidence there was no element of self-defense in this case. Considering the testimony of all the witnesses in the case, excepting that of the defendant, it seems clear to us that the defendant should have been convicted of murder. No person has the right to kill another through unfounded fear or cowardice, and while the defendant's account of the killing differs somewhat from that given by the other witnesses, he is, we think, guilty of murder upon his own statement. However, the court submitted the question of manslaughter in the first degree, and the jury found the defendant guilty of this lower degree.

The next assignment argued is that the court erred in submitting the issue of manslaughter in the first degree against the defendant's objections and exceptions.

It is claimed for the defendant that under the evidence he was either guilty of murder, or should have been acquitted on the ground of self-defense.

Counsel in his brief states:

"There is room for no half way ground in this case. Either the state's theory, unsupported though it may be, or that of the defendant must be correct."

Section 3097, St. 1931 (22 Okla. St. Ann. § 916), Procedure Criminal, provides:

"The jury may find the defendant guilty of any offense, the commission of which is necessarily included in that with which he is charged, or of an attempt to commit the offense."

By numerous decisions of this court the rule is well settled that on a trial for murder, if the evidence demands a conviction of a higher degree of homicide, and does not warrant an acquittal, the defendant is not entitled to a new trial on the ground that, under the instructions so permitting, the jury found him guilty of a lower degree. Lytton v. State, 12 Okla. Cr. 204, 153 Pac. 620; Irby v. State, 18 Okla. Cr. 671, 197 Pac. 526; Harper v. State, 20 Okla. Cr. 43, 200 Pac. 879; Inman v. State, 22 Okla. Cr. 161, 210 Pac. 742; Calloway v. State, 38 Okla. Cr. 418, 262 Pac. 696.

In the case of Wilmoth v. State, 20 Okla. Cr. 453, 203 Pac. 1055, 21 A. L. R. 590, this court held:

"In a prosecution for murder, when the court submits the issue, and the jury finds the defendant guilty of manslaughter in the first degree, in a case where the law and facts make the crime murder, it is an error in the defendant's favor, of which he has no cause to complain."

In Taylor v. State, 44 Okla. Cr. 58, 278 Pac. 1117, this court held:

"In a prosecution for murder when the court submits the issue and the jury finds the defendant guilty of manslaughter in the first degree, although under the law and the facts the crime is murder, yet, if defendant is convicted of a lower degree of homicide than that shown by the evidence, no prejudice could have resulted to him, and this court will not reverse a conviction because of such error."

"Manslaughter in the first degree" is defined as follows:

"1. When perpetrated without a design to effect death by a person while engaged in the commission of a misdemeanor." Section 2223, O. S. 1931 (21 Okla. St. Ann. § 711).

The testimony of the defendant shows that he was carrying a pistol in violation of the statutes making it a misdemeanor, when he fired the fatal shots. Sections 2589, 2590 (21 Okla. St. Ann. §§ 1277, 1278).

It is the province of the jury, if the defendant is found guilty, to determine and fix the degree by their verdict, and where the jury in a homicide case finds the defendant guilty of a lower degree, where the law and facts make it murder, it is an error in favor of the defendant of which he cannot complain. Juries frequently render just such verdicts, and this can only be accounted for upon the theory that the verdict was the result of a compromise of opinion.

The remaining assignment of error is based upon the action of the sheriff who, it appears, as the jury left the courthouse to go to dinner, walked along behind them and ate at the same restaurant, but at a separate table.

It is sufficient answer to this assignment to say that it is wholly destitute of merit.

It appearing that the defendant had a fair and impartial trial, and that no error was committed prejudicial to his substantial rights, the judgment of the district court of Ottawa county is affirmed.

DAVENPORT, P. J., and BAREFOOT, J., concur.