## OTIS SHORT v. STATE.

No. A-9978.  April 23, 1942.
(125 P. 2d 227.)

Phil K. Oldham, Henry O. Boatright, and W. J. Crump, all of Muskogee, for defendant.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., and Douglas Garrett, Co. Atty., of Muskogee, for the State.

BAREFOOT, P. J. Defendant, Otis Short, also known as Otis "Ode" Short, was charged with the crime of murder in Muskogee county, was tried and convicted of manslaughter in the first degree and sentenced to serve a term of eight years in the penitentiary, and has appealed.

This charge involved the killing by defendant, Otis Short, of Robert Dyer in Muskogee county on the 1st day of January, 1940.

It is first contended that the evidence is insufficient to sustain the verdict of the jury and the judgment and sentence of the court.

We have carefully read the record and it is unnecessary to go into a detailed discussion thereof. It was highly conflicting with reference to the action of the parties at the time the fatal shots were fired and as to who was present at the scene of the difficulty. All of the eyewitnesses were close relatives of defendant and deceased. Testifying for the state were the two sons of deceased, Forrest Dyer and Robert Dyer, ages 18 and 13, respectively. For the defendant were himself, his wife, and his son, T. L. Short, 13 years of age, and a nephew, Pete Short, 21 years of age. These were all of the eyewitnesses to the shooting.

The facts briefly stated were that defendant, Otis Short, had for the past four years farmed the premises where the shooting occurred and which was eight miles south and east of Webbers Falls, in Muskogee county. The deceased had leased the premises for the year 1940 and was attempting to obtain possession of the same. There was a dispute with reference to possession which caused this homicide. Defendant and deceased had lived as neighbors for several years and had been friendly, their families visiting each other, and there had never been trouble of any kind. Mrs. Robert Dyer, wife of the deceased, and her sons testified to this relationship. It was corroborated by defendant and his family.

Forrest Dyer, the 18-year-old son of deceased, testified that on Sunday, the 31st day of December, 1939, he and his brother, Robert Dyer, 13 years of age, hauled

seven loads of stove wood from their home to the home of defendant which their father, the deceased, had rented. That on this date the defendant sent word by them to their father that he could move anything on the premises except household goods. That on the next day, Monday, January 1, 1940, he and his father and brother hauled two loads of posts to where defendant lived. They had two teams, he and his father driving one team and his brother Robert the other. That after they had arrived the defendant came with his team and drove into the lot which had a small open shed north of the house, and he began unhitching his team. That his father went into the lot where defendant was, and that he, his brother Robert, and Pete Short, a nephew of defendant, were all in the lot at the time. That he heard his father and defendant have a conversation. That they first talked about a colt that defendant was driving and as to its age. That his father asked defendant if he could move into one of the rooms of the house that day and that defendant told him he could not, that "two families couldn't live in the same house and get along together."

He testified:

"Q. What did they say? A. My father said he didn't see why, they never had any trouble. Ode told him he couldn't move in. He said if there had been any friendship he wouldn't have rented him out. Q. Who said that? A. Ode. Q. Where was Otis when he said to your father if there had been any friendship he wouldn't have rented him out? A. Under the shed. Q. Which way was your father facing? A. North. Q. Was he standing with his body towards the north? A. No, sir. Q. Which way was the front of his body? A. East. Q. Was he talking to Ode at that time? A. Yes, sir. Q. Was he looking at Ode? A. Yes, sir. Q. How was his head? A. Standing north towards Ode. Q. Can you tell the jury whether or not he was turning his head like I am? A. Yes, sir.

Q. When Otis says what you said about no friendship about him what did your father do? A. He turned around. Q. Which way? A. Facing Ode. Q. Did he do anything with his hands? A. No, sir. Q. Did he reach out for Ode with his hands? A. No, sir. Q. When he turned around what if anything did Otis do? A. He jerked the gun and shot him. Q. Where did he take the gun from? A. Bib of his overalls. Q. What kind of overalls did Otis wear at that time? A. I don't remember. Q. Was it one with a high bib? A. Yes, high bib. Q. Which hand did he use when he pulled the gun from his overalls? A. The right hand. Q. Had your father done anything at the time he shot? A. No. sir. Q. What did your father do when he shot? A. He turned and fell. Q. See if I understand. When Otis said that then he turned facing Otis? A. Yes, sir. Q. Then Otis shot him? A. Yes, sir. Q. Did you know at that time where he shot him? A. No, sir. In the breast I think. Q. Did you know at that time? A. No, sir. Q. Then your father fell? A. Yes, sir. Q. Which way? A. He fell south. Q. Did he fall to the right? A. Yes, sir. Q. And when he landed on the ground where was his head? A. It was south. Q. Towards Otis Short or away from him? A. Away from him. Q. How many times did Otis Short shoot? A. Twice. Q. Where was your father or what was your father doing when he shot the second time? A. He was falling. Q. Did your father at any time grab him? A. No, sir. Q. Or grab at him? A. No, sir. Mr. Oldham: If the court please, we object to leading the witness. The Court: Sustained. Q. State whether or not your father did anything after he turned facing Otis Short before he shot the first time? A. No, sir. Q. After your father fell on the ground his head was which direction? A. South. Q. Was that towards the house? A. Yes, sir. Q. And where were his feet? A. Towards the shed. Q. And where was Otis Short with reference to your father's feet? A. He was north. Q. About how far? A. About seven feet. Q. What if anything did Otis Short do after he shot your father the second time—after your father fell to the ground— strike that. Where were you at the time that Otis Short

shot your father the first time? A. I was at the east end of the shed. Q. About how far from your father? A. About seven or eight feet. Q. Were you looking at your father or not? A. No, sir. Q. Did you see Otis Short pull the pistol? A. Yes, sir. Q. After your father fell to the ground what if anything did you do? A. I didn't do anything. Q. Where did you go immediately after your father fell? Did you go anywhere? A. No, sir. Q. Did you go to your father? A. No, sir. Q. What did you next do? A. Otis pointed the gun towards me with the hammer back and told me to get out of there he would shoot hell out of me. Q. Had you done anything? A. No, sir. Q. Had you said anything? A. No, sir. Q. What did you do? A. My brother and I started out southeast. Q. How far did you get? A. About 50 feet. Q. When Otis Short said that was anyone else there or near the house? A. Yes, sir, Pete Short was up there with us in the lot. Q. Did you see Mrs. Short? A. Yes, sir. Q. Where was Mrs. Short? A. She was standing in the yard. Q. Which direction was she from the barn? A. South. Q. And which direction from the house? A. North. Q. How far was she from the fence? A. I don't know just how far, just across the fence. Q. Which fence? A. The horse lot fence. Q. State whether Mrs. Short said anything? A. I don't remember her saying anything. Q. What did you then do? A. My brother and I started out of the lot and Otis run around the barn and got over the fence and started across the field; and I ran back to my father and tried to get him to say something. Q. How was your father lying at that time? A. With his face down. Q. What did you do? A. After he died I turned him over out of the blood. Q. Was he dead when you got to him? A. No, sir. Q. What was he doing? A. Struggling on the blood."

He then testified to seeing the defendant leave the premises going northwest. He further testified that the wife of the defendant and his son, T. L. Short, were not present in the lot at the time of the difficulty, but that the said T. L. Short was about 50 feet southeast of the

house cutting wood. That after the shooting, his younger brother went after his mother and that she returned to the premises and assisted others in taking the deceased to his home, where his body was taken in charge by the undertaker. He also testified that he examined his father's body and he did not have a knife or any other kind of weapon on him. The cross-examination of this witness did not materially alter his testimony. Robert Dyer, the 13 year old son of deceased, corroborated the evidence of his brother, Forrest Dyer, as to all the facts surrounding the killing of his father by defendant. He also testified that he went home immediately after the killing and informed his mother and that she went to the s c e n e through the field. That he got a shotgun and started back, but that he gave the gun to Miss Hendrix, who requested him to do so at the suggestion of his mother. He also testified that he had borrowed his father's knife on Sunday night, December 31st, for the purpose of getting the mud off of his shoes, and that he had laid the same on the mantle, and that his father did not have the knife with him on Monday, January 1, 1940, when he was killed by defendant.

His mother testified she took the knife from the mantle four days after the homicide.

T. Bolding was the undersheriff under John Baxter. He arrived about one hour after the killing and searched the body of the deceased and did not find any knife on his person. He found a whetrock and other minor immaterial articles. He also saw the wounds on the body and assisted in taking the body of the deceased to his home, and also saw the jacket and hat of the deceased, each of which had a bullet hole therein. Other witnesses testified for the state, but it is unnecessary to relate their testimony, as it was immaterial to the issues here involved.

The defendant, Otis Short, testifying in his own behalf, corroborated the evidence of the witnesses for the state up to the time of the actual killing. He stated that he had sent word to the deceased by his sons on Sunday, December 31, 1939, that he could move anything on to the premises except household goods, and that he would move out on the following Wednesday whether he had secured another place or not. That on Monday morning he took two loads of canned fruit to the home of his brother, Russell Short, and had taken other things there prior to that time and was getting ready to move and give deceased possession of the premises on Wednesday. That he returned to his home near noon and that his nephew, Pete Short, accompanied him. That he drove into the lot and began unhitching his team. That deceased and his two sons came into the lot from the front of the house where they had left their teams. That he and deceased had a conversation, first with reference to a young colt that he was driving, and then with reference to the possession of the premises. That deceased asked him for possession that day of one or two rooms. That he told him he could not because "there was not room for both of us and there was not enough water in the well for both of us." That deceased told him that the parties who rented the place were going to move in on him. They were coming from Enid and he hated to disappoint them. That some conversation was had between them, and deceased said, "To hell with the law," and reached for him with his left hand and put his right hand toward his pocket or still had it in his pocket.

He testified:

"Q. Did he say anything else? A. He mumbled something. He was so close to me I had to watch his hand and step backwards to keep him from getting hold of me. Q. About how far apart were you? A. I will say

two and a half feet. Q. Just tell what he did. A. Well, he made looked like one step and come towards me and his left hand reaching towards my shirt collar. I stepped back, I don't know whether one or more. As I stepped back I reached for my gun and pulled my gun and shot twice as quick as I could. Q. Why did you shoot him? A. Well, I knowed in reason he had a knife. Mr. Garrett: If the court please, we want to object to that as not responsive. The Court: Sustained. Mr. Oldham: Note our exception. Q. Were you scared of him? A. Yes, sir. Q. I will ask you again, why did you shoot him? A. Because he was coming towards me and reaching for me. Q. Did you have any fear for your life? A. Absolutely. Mr. Davis: Your honor, that is not proper. That is leading and suggestive. Mr. Garrett: And repetition. Mr. Oldham: I don't know any other way to ask him, Judge. The Court: All right. Overruled. Q. Otis, state whether or not you took any aim or what you did? A. No, sir, I did not. I just pulled my pistol out. I cocked it the first time as I brought it out and pulled the trigger, and pulled the hammer back and shot again. Where it was I couldn't say. I just pulled it out."

He left the premises immediately after the shooting and went to the home of a friend who took him to Muskogee and he surrendered and was placed in jail. Defendant testified to many other minor details which it is unnecessary to relate. He was corroborated by his wife, his son, T. L. Short, and his nephew, Pete Short, all of whom testified they were in the lot at the time of the killing. There were minor discrepancies, but their evidence was substantially the same as defendant's.

Many witnesses were presented by defendant who testified to his good reputation and character and to the bad reputation of deceased as being a quarrelsome and troublesome person. The state also offered in rebuttal witnesses who testified to the bad reputation of defendant and the good reputation of deceased. There were a number of

witnesses who testified to minor details and conversations with the defendant both prior to and subsequent to the killing, also those who testified to previous difficulties of deceased with other persons over a long period of years. There is a direct conflict between two of the witnesses as to whether the second shot entered behind the left ear of deceased and came out by the side of the nose or whether it entered by the side of the nose and came out behind the left ear.

From the above statement it will be readily seen that there was a direct conflict in the evidence of the state and the defendant. Under the many decisions of this court this was a question for the determination of the jury. It is only where the evidence is insufficient to support the verdict that the judgment and sentence will be set aside by this court on appeal. The citation of authorities to support this proposition is unnecessary. We are therefore of the opinion that the court did not err in refusing to sustain the demurrer to the evidence or not directing a verdict of not guilty.

The next assignment of error presented has reference to the admitting of incompetent, irrelevant and immaterial testimony and the refusal of the court to admit competent, relevant and material evidence offered by defendant.

In order to properly consider this assignment it is necessary to read all of the record in this case. We have done so very carefully and do not find any error that would justify a reversal thereof.

At the beginning of the trial counsel representing defendant asked for and was granted the rule. He then offered two witnesses who had disregarded the same and remained in the courtroom. These witnesses were not eyewitnesses to the difficulty. Their evidence was with reference to a difficulty between one of the witnesses and deceased which occurred some six years prior to the

act here charged. There was no evidence to show that defendant had any personal knowledge of this difficulty. The court was very liberal in allowing a great number of witnesses to testify before the jury as to the bad reputation of deceased as a troublesome and quarrelsome character, also permitting a number of witnesses to testify that they had personal encounters with deceased. This court has announced the rule with reference to admission of evidence of specific acts of violence on the part of deceased in the case of Elliott v. State, 18 Okla. Cr. 230, 194 P. 267, where it is said:

"Before evidence of specific act of violence on the part of the deceased toward third persons, in a homicide case where self-defense is pleaded, is competent, a predicate must be laid by offering to show by the defendant that he had knowledge of such specific acts prior to the commission of the homicide. Where no such showing is made, and the entire defense of self-defense is based upon the acts and conduct of the deceased at the time the homicide was committed, the alleged error of the trial court in excluding evidence of specific acts of violence toward other persons is not prejudicially erroneous."

The permitting of witness Ira Lipe to testify was a matter within the sound discretion of the trial court.

It is contended that the court erred in refusing to permit the defendant to testify that deceased had told him that 20 years previous to the present difficulty he had held another person at arm's length and cut him with a knife by reason of the length of his arms. To our mind this evidence was admissible and the court should have permitted the defendant to so testify, but in view of the record as a whole, we do not think the defendant was prejudiced by the refusal of the court to permit the defendant to testify to that fact. The court was very liberal in permitting the defendant to testify as to his fear of the deceased and as to the threats which he had heard.

We do not think the jury was prejudiced against the defendant in any way. The objection to the introduction of the jacket worn by the deceased at the time of the shooting cannot be sustained. It was shown that this jacket had a bullet hole in it, and we cannot see how its admission could have prejudiced the rights of the defendant in view of all the evidence.

It is also urged that the court erred in giving instruction No. 15, which was as follows:

"You are instructed that the state, or any private person interested in the prosecution of one charged with a criminal offense, may employ any authorized practicing attorney to appear in any such cause as a special prosecuting attorney, and the said attorney so employed has the same authority in the trial of said cause as the county attorney or his assistants may have."

There is no law justifying the giving of this instruction and we do not know why the court gave the same. There is no law giving the state the right to employ private counsel, and private counsel employed in a criminal case have no special authority such as has the county attorney whose duty it is to represent the state in criminal prosecutions. He is present only through the grace of the county attorney, and no instructions should be given with reference to his appearance. However, there is nothing in the instant case that could in any way prejudice the defendant, and any error in the giving of the same was harmless. Watson v. State, 7 Okla. Cr. 590, 124 P. 1101; Schulte v. Board of Com'rs, 122 Okla. 205, 253 P. 494; Smith v. State, 37 Okla. Cr. 85, 256 P. 944; Sanders v. State, 50 Okla. Cr. 274, 296 P. 764.

It is next contended that the court erred in giving that part of instruction No. 7 which is as follows:

"The foregoing, are, in short, the general rules gov-

erning the law of self-defense, but the plea of self-defense is not available to a person who arms himself for the purpose of seeking and engaging in a difficulty, nor to be an aggressor, nor to one who uses unreasonable and unnecessary force to repel an assault."

If he had been found guilty of murder, there might be substantial merit in this contention, but defendant was only found guilty of manslaughter in the first degree and not guilty of murder. Under the statute covering manslaughter, 21 O. S. 1941 § 711, St. 1931, § 2223, one who seeks or provokes a difficulty without any intention of killing or doing serious bodily injury to the deceased, but only intending an ordinary battery is guilty of manslaughter. In view of this statute, the defendant could not have been prejudiced by the giving of the above instruction.

It is next urged that the court erred in giving instruction No. 10. This instruction is with reference to manslaughter. In it the court charged in the language of the statute, "did shoot, wound and kill the said Robert Dyer while engaged in the commission of a misdemeanor." It is admitted that the instruction is right as an abstract proposition of law, but that it is misleading for the reason "there was no proof that the deceased lost his life by reason of the fact that the defendant was engaged in the commission of a misdemeanor at the time of the homicide." The two cases cited by defendant as upholding this doctrine are Porter v. State, 50 Okla. Cr. 136, 297 P. 305; Logan v. State, 42 Okla. Cr. 294, 275 P. 657. In both of these cases which were affirmed it was said:

"Where a defendant is convicted for manslaughter by causing the death of another in the commission of a misdemeanor by operating an automobile at an unlawful rate of speed, and upon the undisputed facts it clearly and conclusively appears that the unlawful act complained of was the proximate cause of death, a failure to charge

that the unlawful act must be the proximate cause of death, in the absence of a request, is not reversible error."

It has been the universal holding of this court from an early day that if counsel for an accused desires additional instructions they must reduce such instructions to writing and request that they be given, and a conviction will not be reversed where there is a failure to make such request, unless the court is of the opinion in the light of the entire record and instructions that, because of failure to instruct upon some material question of law, accused has been deprived of a substantial right. Lumpkin v. State, 5 Okla. Cr. 488, 115 P. 478. As above stated, the charge of the court was in the language of the statute. No requested instruction was offered by defendant.

This instruction should be considered in the light of all the instructions in this case, and in instruction No. 7, the court among other things instructed the jury as follows:

"e. The person unlawfully attacked has the right to use whatever force reasonably appears to him under the circumstances to be necessary to repel the attack or threatened attack and avoid injury to himself even, to the extent of taking human life—and if, when viewed from his standpoint at the time, it reasonably appears that the killing was necessary to prevent death or great personal injury to himself, then the killing will be justifiable."

The court presented fairly and impartially the question of justifiable homicide by reason of self-defense in a proper manner, and we find nothing therein that would justify a reversal of this case under the law and the evidence. Fisk v. State, 62 Okla. Cr. 305, 71 P. 2d 499; Welborn v. State, 70 Okla. Cr. 97, 105 P. 2d 187.

For the reasons above stated, the judgment and sentence of the district court of Muskogee county is affirmed.

JONES and DOYLE, JJ., concur.