## BENNIE JAMES VESTER v. STATE.

No. A-10143.    April 7, 1943.

(136 P. 2d 205.)

Amos Hall, of Tulsa, and H. A. Johnson, of Perry, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., and Judson H. Pierce, Co. Atty., of Perry, for defendant in error.

BAREFOOT, J. Defendant, Bennie James Vester, was charged in the district court of Noble county with the crime of murder, was tried, convicted, and sentenced to serve a term of 30 years in the State Penitentiary, and has appealed.

Defendant, in his brief, assigns as error: First, that the evidence is insufficient to sustain the judgment and sentence; second, that the sentence imposed is excessive and was rendered under passion and prejudice; and third, error of the court in refusing to give requested instructions, and in failing to give certain instructions.

The first assignment of error demands a brief review of the evidence, as revealed by the record.

Defendant, Bennie James Vester, was charged by information in Noble county with the crime of murder, it being alleged that he killed Vester Wilhelm by stabbing and cutting him with a pocket knife, on the 1st day of January, 1941, from which wounds so inflicted the said Vester Wilhelm died on the 4th day of January, 1941.

Defendant was a negro man 25 years of age, and the deceased was a United States soldier of the age of 20 or 21 years. Both were residents of the city of Perry, where the killing occurred. The defendant, on the night of the difficulty, had attended a picture show at the negro high

school, at Perry, and with a number of negro boys was returning to his home between 10 and 10:30 at night. They took a short cut across a vacant lot by the Cain Hotel. While passing, they encountered some soldier boys who were stationed at Fort Sill, but who resided in Perry and were spending the Christmas holidays at home. One of the colored boys, 15 years of age, made a disre-- spectful remark about soldiers, which offended the soldier boys, who were standing by a car near the Cain Hotel. The first witness for the state, Glenn Jones, who was an eyewitness to all the proceedings, testified as follows:

"Q. State your name to the court and jury. A. Glenn Jones. Q. Where do you reside, Mr. Jones? A. 115 Third street. Q. Here in Perry? A. Yes. Q. How long have you resided in Noble county? A. Off and on about eight years. Q. How old are you? A. I am 20 now. Q. Twenty? A. Twenty years old. Q. Do your parents live in this county? A. Yes, sir. Q. Where did you go to school the last five or six years? A. Perry. Q. You attended the high school here, and part of the grade school? A. No, just the high school. Q. Are you now employed? A. I am in the Army right now. Q. How long have you been in the Army? A. About six months. Q. Where have you been stationed? A. Fort Sill. Q. Have you recently been moved? A. Yes. Q. Where to? A. Abilene, Texas. Q. You are in the regular training under the Defense Program, are you? A. Yes, sir. Q. With what particular military organization are you connected? A. I am with Battery C, 158 Field Artillery. Q. Were you acquainted with Vester Wilhelm in his lifetime? A. Yes. Q. How long have you known him? A. I have known him about seven years. Q. Did he go to school at the same time you did? A. Yes. Q. Did you both play on the football team here. A. Yes. * * * Q. State to the court and jury what happened? A. There was a bunch of us up there dancing— Q. State who. A. Billy Smith, Junior Jones, Vester Wilhelm, Jowena Lacy and myself was there, a

few other boys, I don't remember all of their names Q. Relate what happened. A. It was around 10 o'clock or 10 :15 we were getting ready to go back to camp— Q. When were you due at Fort Sill? A. We were due back in the morning for reveille, and Junior Jones and myself went outside to get in the car and some colored boys came up and make a remark about a soldier— Q. Did you hear the remark? A. Yes, I heard the remark. Q. I wish you would state to the jury what the remark was. A. He said something about a soldier with a bullet up his ass. Q. Then what happened? A. They went on up the street east. Q. You mean through that driveway? A. Through the driveway on the south side of Cain's there, and they told us to come on up, and we told them to come on back down to where we were, and so, Vester at that time and Jowena Lacy— Q. Vester Wilhelm? A. Vester Wilhelm and Jowena Lacy were in the car on the south side of the driveway, and we stopped there and told Vester that we were having some trouble with some colored boys up here, and so Vester got out of the car and went up the alley there at the corner on Fir just behind myself, and we told them to come back down where we were, and they said 'come on up there.' In the meantime they had got on up to this colored church on the corner, and so they hollered and said they would meet us half way, so we went on up half way into the street, up on Fir street, about half way, so they came back down. I noticed when they came down they all had clubs but the defendant, he never had anything that I could see, and we argued back and forth, I thought it was all over with, we was getting ready to leave when Bennie Vester stepped up in the road in front of Vester Wilhelm and they started to arguing back and forth, and he told him he had a knife and would use it if he tried to start anything, and his brother, I think it was his brother, went up to Bennie Vester and grabbed him by the arm and told him to 'come on, let's go,' I never thought anything about it, I thought it was all over with — (objection made and sustained as to what he thought, and the jury instructed to disregard the last statement). A. About that time some of

the kids came up in a car, Raymond Sanders and Jowena Lacy, I don't know, quite a few, I think about six or seven, I don't know how many there were exactly, and they were standing back there along on the left side of the car— The Court: Who was? A. Bennie Vester and Vester Wilhelm. Bennie Vester was kind of to one side— he would have to push him to one side to get to the car, they were arguing, and he pushed him, and when he pushed him, why he stabbed him, and Vester Wilhelm fell back against the back of the car— The Court: Who stabbed who? A. Bennie Vester stabbed Vester Wilhelm, stabbed him, cut him with his knife and he started backing up and Bennie Vester followed him and he fell against the car and then he staggered over to the ditch, I don't know, he stabbed him either two or three times and he fell in the ditch and they all ran. Q. All of the colored boys ran, you say? A. Yes. Q. Did this all transpire suddenly? A. Yes, sir. Q. Now, Glenn, which direction was Vester Wilhelm moving, or what was he doing at the time he started to get in the car? A. Well, they were facing about—Vester Wilhelm was facing about east, and Bennie Vester was in front of him, kind of to the right of Vester Wilhelm and the car was a little ways off farther east—the car was facing the east. Q. I mean, was Bennie Vester facing Wilhelm? A. He was looking west. Q. Facing Wilhelm? A. Yes. Q. Then as I understand it, Mr. Jones, when Wilhelm started as if he were going to get into the car he put his hand out and pushed the defendant? A. Yes. (objected to as leading, objection sustained). Q. Mr. Jones, did you, or to your knowledge any of the rest of you white boys, have any weapons of any kind there on that evening? A. No, sir. Q. Was there any threats made by you or any of the other white folks against either of these colored folks? A. No, sir. Q. Was there any colored person injured there on that occasion? A. Not that I know of, no, sir. Q. Which direction did the colored boys go immediately after Wilhelm went down? A. Northeast, they all scattered out, but they all ran toward the northeast. Q. Back down the street? A. Back down the street toward the church

house. Q. What did you folks do? A. Well, I went for a doctor, and some one went for the police, and some one stayed there with Vester. Q. Some of them stayed there? A. Some of them stayed there, I went for the doctor myself, some stayed there with Vester Wilhelm to see what they could do for him. Q. As soon as it could be organized was Wilhelm taken to the hospital? A. Yes. Q. Did you see any blood on the ground? A. Yes. Q. Where was it, in relation to Wilhelm's body? A. Well, there was blood where he had fell in the ditch, there was a lot of blood, and some blood on up east. Q. Was his body moved from where it first fell, up into the street? A. Yes, they moved him up into the street. Q. Was there blood there, too? A. Yes. Q. Well, would you say any considerable quantities? A. There was an awful clot of blood, yes."

On cross-examination this witness testified that the three white soldier boys followed the negro boys for a distance of about half a block for the purpose of trying to get them to straighten out the statement that had been made about the soldiers. The negro boys came back about one-fourth of a block to meet the white boys. One of the soldiers went back and got some other white boys who came in a car. He testified that the boys would have probably tried to whip the negro boys if they could have, if the matter was not straightened out. He testified on his direct examination as to how the cutting occurred, that the defendant was standing with his hands in his pockets, that the argument was about over and that deceased asked the defendant to take his hands from his pockets and that he refused; that defendant's brother took him by the arm and tried to get defendant to go away, but he jerked loose and refused to go. Just at this time deceased started to the car and pushed the defendant out of the way, and was stabbed and cut three times by the defendant.

This evidence was substantially corroborated in every detail by Dick Hall, 20 years of age, Robert William Foster, 20, Carl Wilson, 18, Billy Smith, 21, Quine Brengle, 21, Raymond Sanders, 20, and Kathleen Wright, 17 years of age. Each of the witnesses gave substantially the same evidence. All were friends of the deceased, and had previously gone to school with him at Perry, and were then attending different colleges and the University of the state.

Merle Harmon, sheriff of Noble county, testified to the arresting of the defendant on the night of the difficulty, and of securing from him a knife which the defendant stated he had used in doing the cutting and stabbing. He testified that defendant afterwards admitted that this was not the knife used, and directed the sheriff to his wife, who had the knife that he had used. The knife was given to the sheriff, and introduced in evidence.

Defendant testified in his own behalf, and to a great extent corroborated the testimony of the state's witnesses, except that he claimed the deceased struck him with his fist, and was continuing to strike him at the time that he cut and stabbed him. He testified that he opened the knife in his pocket, and demonstrated to the jury how it was done. His testimony was corroborated by Billy Williams, 17 years of age, by Calvin Brown, 16, and Tommy Shelton, 16, who were present at the time of the difficulty. James Riley, the young boy 15 years of age who made the remark which caused the trouble, also testified, but he had run away and was not present at the scene of the difficulty. Defendant also introduced in evidence eleven character witnesses, who testified to his good character and reputation previous to this trouble.

From the above, it will be noted that the contention of the defendant that the judgment and sentence rendered in this case is contrary to the evidence cannot be sustained. There was a conflict in the testimony of the state and the defendant, but under the testimony of the defendant, he was not justifiable in cutting and stabbing the deceased, as he did.

With reference to the judgment and sentence being excessive and rendered under the influence of passion and prejudice, we have carefully examined the entire record. This was an unfortunate and an unjustified killing. The evidence of the state and the defendant reveal that neither deceased nor any of his companions were armed at the time of the difficulty. No one suspected there would be a killing. A fight was all that was anticipated. No act of the deceased justified the defendant cutting or stabbing him. Defendant was 25 years of age, much older than the other colored boys with whom he was associated. When they procured clubs for the purpose of returning to meet the soldier boys, he opened his knife and had it in his pocket, and when deceased pushed him to one side for the purpose of entering the car, he pulled his knife from his pocket and stabbed deceased at least three times, one of the wounds being at or near the heart, and from the effects of which he died. The jury who heard the case came to the conclusion that there was not a premeditated design to commit murder by defendant, but found him guilty of manslaughter in the first degree and assessed his punishment at 30 years in the State Penitentiary. There is nothing in the record which causes us to believe that the punishment assessed is excessive or that it was rendered by reason of passion or prejudice. Under the facts as presented by the state, a verdict of murder would be sustained. Evidently the jury took into

consideration the evidence of defendant when a verdict was rendered finding him guilty of manslaughter in the first degree, and assessing his punishment at 30 years in the State Penitentiary.

Defendant requested 13 special instructions. These instructions are centered around the right of self-defense. We have carefully examined the instructions given by the trial court. The instructions given embodied practically every suggestion offered in the refused instructions, six of the requested instructions being given by the court. The instructions fully presented the plea of self-defense as applied to the evidence, and protected the right of the defendant in every way, and we find no error that would justify a reversal of this case. Trott v. State, 62 Okla. Cr. 52, 70 P. 2d 118; Daniels v. State, 68 Okla. Cr. 324, 98 P. 2d 68. Exception was taken by defendant to only one instruction. It is unnecessary to set out in full the requested instructions, and the instructions given by the court. It would unduly lengthen this opinion.

Defendant complains that the court did not instruct the jury upon the question of good character. A number of witnesses testified as to the good character of the defendant. If defendant had requested the giving or had presented a written instruction to this effect, it would have been proper to give the same. It is not revealed that any such written request was made. Defendant cites only the case of Morris v. Territory, 1 Okla. Cr. 617, 99 P. 760, 774, 101 P. 111. In that case a written requested instruction was presented. The same was denied and the case was affirmed. In the opinion, by Presiding Judge Furman, the court said:

"The evidence of the character of the defendant, both for and against him, was before the jury. They were correctly instructed that the presumption of innocence

and the doctrine of reasonable doubt were applicable to all of the evidence in the case. It would have been better for the court to have given an instruction upon character, embodying the views expressed by the Supreme Court of the United States in White's case [White v. United States, 164 U.S. 100, 17 S. Ct. 38, 41 L. Ed. 365], hereinbefore quoted and approved. In some cases, it might be reversible error to fail to give such an instruction; but our statute requires us to construe laws liberally and in the furtherance of justice, and forbids us from reversing a conviction upon a technical error or an exception that does not affect the substantial rights of the defendant. In this case we do not believe that an intelligent and honest jury could be found who, with a due regard for their oaths, and the testimony and the law, could ever come to any other conclusion than that the defendant was guilty of murder. Under the statute, above quoted, and after a consideration of the entire record, we are constrained to hold that in this case reversible error was not committed by failure of the court to instruct the jury upon the question of character."

In the annotation in Oklahoma Statutes Annotated, 1941, Title 22, sec. 831, note 309, in quoting the case of Lumpkin v. State, 5 Okla. Cr. 488, 115 P. 478, it is said:

"Under subdivision 5 of this section, and section 856 of this title, the judge is required only to give in charge such matters of law as he thinks necessary for information of the jury in rendering their verdict, which instructions must be settled after the introduction of evidence is concluded, and, if counsel for accused desire additional instructions, they must reduce such instructions to writing and request that they be given, and a conviction will not be reversed where there is a failure to make such request, unless the Criminal Court of Appeals is of the opinion in the light of the entire record and instructions that, because of failure to instruct upon some material question of law, accused has been deprived of a substantial right." Lee v. State, 67 Okla. Cr. 283, 94 P. 2d 5; Green v. State, 70 Okla. Cr. 228, 105 P. 2d 795; Pulliam

v. State, 61 Okla. Cr. 18, 65 P. 2d 426; Short v. State, 74 Okla. Cr. 272, 125 P. 2d 227; Adams v. State, 62 Okla. Cr. 167, 70 P. 2d 821.

In the instant case, the court instructed the jury upon the question of reasonable doubt, and upon the presumption of innocence, and under the facts, as above stated, we are of the opinion that it was not error for the court to fail to give an instruction as to the good character of the defendant when the same was not requested by counsel for defendant.

For the reasons above stated, the judgment and sentence of the district court of Noble county is affirmed.

JONES, P. J., and DOYLE, J., concur.