# WALTER FIELDS v. STATE.

No. A-10699.   Oct. 29, 1947.
Rehearing Denied Jan. 7, 1948.
(188 P. 2d 231.)

440

Guy P. Horton, of Altus, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

BRETT, J. The defendant, Walter Fields, was charged with the crime of murder of one Jerry Miller. He was tried, convicted of first degree manslaughter, and sentenced to ten years in the penitentiary.

The sufficiency of the evidence to warrant the jury in finding the defendant guilty and fixing his punishment at ten years in the penitentiary is not questioned. The contention of error is based on other grounds.

In his first three assignments of error, in his brief, the defendant urges that the court erred in its instructions 8, 9, and 10, on the theory that instruction No. 8 did not properly present the defendant's right of self-defense; that instruction No. 9 did not properly present the defendant's theory as to the effect of the threats made by the deceased against the life of the defendant; and that instruction No. 10 did not properly present his claim of self-defense

in relation to his right to protect himself from serious bodily harm. Nowhere in the record, except in the motion for new trial, does it appear that the defendant made any objections to the instructions which the court gave. Only in the motion for new trial, it is stated that objections were made and exceptions duly allowed. The record, however, does not support that allegation of the motion for new trial. This court has held that, "errors assigned upon instructions given by the trial court will not be considered upon appeal, where the record fails to show that any objections were made or exceptions taken to such instructions at the time they were given." Cruzan v. State, 13 Okla. Cr. 71, 161 P. 1179. In Sing v. State, 4 Okla. Cr. 544, 113 P. 204, it was held that, "matters occurring during the trial of a case which counsel desire to assign as error must appear by proper recitals in the case-made duly certified to as the law provides, independently of the motion for a new trial." In Giles v. State, 70 Okla. Cr. 72, 104 P. 2d 975, 978, this court said:

"Where no exceptions to the instructions are taken until after they are read to the jury, such exceptions will be unavailing unless the errors are of a fundamental character."

In this connection, counsel for the defendant Fields offered no requested instructions and made no suggestion that any different instructions be given other than those that the court gave. In Vester v. State, 76 Okla. Cr. 235, 136 P. 2d 205, this court said:

"If counsel for defendant desires additional instructions they must reduce such instructions to writing and request that they be given, and a conviction will not be reversed where there is a failure to make such request unless the Criminal Court of Appeals is of the opinion in the light of the entire record and instructions that, because

of failure to instruct upon some material question of law, accused has been deprived of a substantial right."

See, also, Short v. State, 74 Okla. Cr. 272, 125 P. 2d 227; Green v. State, 65 Okla. Cr. 463, 88 P. 2d 907; Adams v. State, 62 Okla. Cr. 167, 70 P. 2d 821; Carpenter v. State, 56 Okla. Cr. 76, 33 P. 2d 637. In Ford v. State, 52 Okla. Cr. 321, 5 P. 2d 170, 171, this court held:

"It is not error for the trial court to omit to instruct upon every possible question under defendant's theory of the case, when he has not requested such instructions."

We have carefully examined the instructions given by the court and find that they substantially presented the defendant's theory of self-defense, the effect of threats made by the deceased, and his theory of self-defense in relation to serious bodily harm. The defendant assigned, as erroneous, instructions 11 and 12, but did not urge them. We have carefully examined the instructions as a whole and while they are not by any means perfect, they are not fundamentally erroneous.

The fourth assignment of error urged by the defendant is that the court erred in sustaining the objections of the state to evidence showing the deceased had told the defendant of other specific acts of violence the deceased had committed against other people. It was error for the court to sustain this objection. It was entirely proper for the defendant himself to give testimony in relation to what the deceased told him as to acts of violence which he, the deceased, perpetrated against other parties. It was relevant as touching upon the defendant's belief that the deceased was a dangerous and violent man. It constituted a proper element of the defendant's theory of self-defense. Murphy v. State, 72 Okla. Cr. 1, 112 P. 2d 438, is in point, wherein Brock v. State, 55 Okla. Cr. 410,

32 P. 2d 88, 89, is cited as authority for the proposition that it is proper for the defendant to testify relative to acts of violence which the deceased had told defendant he committed on other persons. In the Brock case, this court said:

"The question before the jury was not whether the stories told by deceased to defendant of his quarrels, brawls, and difficulties were true, but was; Did defendant believe deceased had committed such acts detailed to him and by reason thereof believe deceased was a dangerous and violent man, and, acting on such belief, commit the killing in his own self-defense."

In this connection, however, the record discloses that the defendant was not prejudiced by the ruling of the court. It discloses the following:

"Q. Had Jerry ever told you of killing anyone? A. Yes, sir. Mr. Rutherford: 'We object to that as incompetent and immaterial, and we object for the further reason it is incompetent, irrelevant and immaterial and improper examination.' Mr. Horton: 'He asked him himself and I am cross examining him on that.' The Court: Objection sustained. Mr. Horton: We except."

It appears from the record that the question with reference to acts of violence was answered before the objection was interposed. The jury, therefore, had the benefit of the answer. The state did not move to have it stricken from the jury's consideration. The defendant had the benefit of the answer and the erroneous ruling of the court is harmless.

The fifth contention of the defendant is that the court overruled his objection to the following question:

"Q. Then can you explain to the jury since you are testifying now that this boy Hugo Henderson, took a gun off the deceased, Jerry, after you killed him, why you

didn't—your lawyer didn't ask Hugo Henderson about that in the preliminary hearing instead of your testifying to it now. Explain to these gentlemen."

The record discloses, in this connection, the transcript of the evidence of Hugo Henderson taken at the preliminary hearing was read into the record. That transcript shows that no inquiry was made of Hugo Henderson either by the state or by the defense, relative to Jerry Miller being either armed or unarmed. However, the defendant in his evidence in chief testified that after the killing he saw Hugo Henderson remove a bottle of whisky, a black automatic pistol, and some money from the deceased's person. We believe that it was proper for the state to show on cross-examination that this testimony was not alluded to at the preliminary hearing on the cross-examination of Hugo Henderson. It was proper for the state to show the defendant's failure to elicit so important evidence to his defense from Hugo Henderson at the preliminary hearing. This was proper because it went to the weight of the defendant's evidence. It was an attempt to discredit the defendant's testimony in this regard.

We think this position is in keeping with the law announced by this court in such cases. In this connection, see Harrold v. Territory, 18 Okla. 395, 89 P. 202, 10 L. R. A., N. S., 604, 11 Ann. Cas. 818, wherein the court said:

"A prisoner who takes the witness stand in his own behalf waives his constitutional privilege of silence, and the prosecution has the right to cross-examine him upon his evidence in chief with the same latitude as would be exercised in the case of an ordinary witness, as to the circumstances connecting him with the crime.

"On cross-examination of a witness, the party cross-examining should be confined to the matters concerning which the witness has been examined in chief, but this rule should be liberally construed so as to permit any

question to be asked on cross-examination which reasonably tends to explain, contradict, or discredit any testimony given by the witness in chief or to test his accuracy, memory, skill, veracity, character, or credibility."

See, also, Brock v. State, supra, wherein this court said:

"But where defendant takes the witness stand, his right to remain silent on cross-examination is waived, and he subjects himself to the same nature of cross-examination as any other witness. Harrold v. Territory, [supra]; Graham v. State, 28 Okla. Cr. 266, 230 P. 763; Davis v. State, 35 Okla. Cr. 156, 249 P. 164; Radney v. State, 36 Okla. Cr. 240, 253 P. 913.

"The only right defendant has to refuse to answer after he takes the witness stand is to refuse to answer any question which might incriminate him as to some other crime. * * *

"This cross-examination * * * is controlled by the rule that statements and conduct of a witness contrary to and inconsistent with his testimony may be inquired about on cross-examination."

In Creek v. State, 16 Okla. Cr. 492, 184 P. 917, 919, this court said:

"If, on direct examination, he opens a certain subject for investigation, he cannot be heard to complain if on cross-examination questions are asked him, the answers to which would tend to limit, explain, or modify the testimony he has given in chief."

See, also, in this connection, Davis v. State, 58 Okla. Cr. 139, 50 P. 2d 755; Janeway v. State, 62 Okla. Cr. 264, 71 P. 2d 130.

Quite a different situation however, is presented in relation to the specific question and particularly to that part as to "why didn't your lawyer ask Hugo Henderson

about that in the preliminary hearing instead of you testifying to it now?" It was not a proper matter of inquiry to ask this defendant why his lawyer didn't ask a certain question at the preliminary examination. We think it would be entirely improper to ask any defendant, at the trial on the merits, why his lawyer didn't ask a certain question at a preliminary hearing, for two reasons: In the first place, it would be calling upon the witness to state a conclusion without any possible means of knowing what the correct answer would be. (No doubt counsel for the defense wonders, himself, why he did not ask the question at the preliminary hearing.) Such a question plunges the whole matter into the realm of rank speculation. Second, it seeks to inquire into the motives of defendant's counsel, who himself was not on trial. Courts should require counsel to confine their questions to the facts in issue. Motives of counsel in omitting to ask certain questions are generally not directly in issue. Such a question is not ordinarily proper cross-examination. However, we are of the opinion that while it was error to permit the inquiry as to why counsel did not ask a certain question, it was not such error as tended to prejudice the substantial rights of the defendant.

The defendant, in his sixth assignment of error, urges that the court refused to grant him a continuance on account of the absence of James White whom he alleges to be a material witness in his defense, and that the court's refusal forced the defendant to testify in his own defense. As to the diligence used to procure White's presence and as to the materiality of White's evidence, the defendant alleges in his affidavit, attached to the motion for continuance, as follows to wit:

"Walter Fields, of lawful age, being sworn, deposes and says: That he is defendant in the above entitled cause;

that he is unable to proceed to trial of this cause at this time, for want of material evidence, to-wit: The evidence of James White, who is a material witness in this case and defendant has used diligence to obtain his evidence, in this, to wit: That on the 29th day of Jan. 1945, he caused a subpoena to be issued by the court clerk of Jackson county, Oklahoma, and placed in the hands of the sheriff of Jackson county, to be served upon James White, commanding him to be present in court on the 7th day of February, 1945, to testify in behalf of this defendant. That after said subpoena was issued, but before it was served upon said James White, and without the knowledge of this defendant, the said James White departed this state, in response to the order of James E. Byrnes, war man power commission, to either work or fight, to work in a war production plant located at Camden in the State of Arkansas; defendant further swears that he had no knowledge that said James White was going to leave the state, that if he had so known that he would have taken his deposition to have been used in the above styled cause; but the defendant expects to have the evidence of said James White by the next term of this court.

"Defendant expects to prove that if said witness were present in court that he would testify to the following facts:

" 'My name is James White, and am over 21 years of age. I reside in Altus, Oklahoma and have so resided for a number of years. I am well acquainted with the defendant Walter Fields and the deceased, Jerry Miller. That on the morning of July 4, 1944, I was walking along on the North side of West Nona street in the city of Altus, looking for the defendant, Walter Fields, when he saw Jerry Miller in the doorway of his place of business. That I asked Miller if he knew where I could find Walter Fields, and he replied that he did not know, and then told him that Walter Fields has stolen some money from him while he, Jerry Miller, was drunk, and further stated that if he saw that black son of a bitch to tell him that he said that if he did not dig up that money he stole from him

before night that he would kill him the first time he saw him. And as he made the statement, he drew a pistol and gave it a slight shake and said, 'I mean business.' That I then left and was standing in front of the Harlem Club when I saw Walter coming out of a building operated by 'Starchy' Cunningham; that I called Walter to one side and told him what Jerry Miller had said. That after standing there and talking a few minutes longer, the defendant, Walter Fields, asked me if I had my car close. and I stated that I did. Then he said he wanted to see Harry Kimbell, who was sheriff of Jackson county, and asked me if I would drive him up to the courthouse. I answered that I would and we first went to the courthouse, but the sheriff's office was locked up, it being the 4th of July, and a National Holiday. We then next went to the jail but could rouse no one. Then Walter asked me to drive him to Mr. Kimbell's home, which is in the north part of town, about a mile from the court house and jail. When we reached Mr. Kimbell's house, I stopped the car and Walter went around to the back door and knocked. That Mrs. Kimbell came to the door and they talked a few minutes, and Walter returned to the car and we drove back down to Nona street in the colored section of town and Walter got out. And that was the last I saw of him until after the shooting.' And this affiant believes the same to be true; that this application is not made for delay, but that substantial justice may be done, and defendant asks that the above styled cause be continued until the next regular term of the district court of Jackson county."

The record shows that the crime for which the defendant is being tried was committed on July 4, 1944. The case was set for trial February 7, 1945. It is therefore apparent that the defendant had ample time in which to prepare for trial, ascertain the availability of witnesses, and procure their evidence through which he would seek to establish his defense. However, he waited until only eight days before trial date and on January 31, 1945, before issuing a subpoena for James White, whom it is al-

leged had gone into Government service as a war worker at Camden, Arkansas. It appears that the subpoena, to which reference is made, is not attached to the motion for continuance—it should have been. The subpoena, together with the sheriff's return, would have thrown light on the question of due diligence. The burden was upon the movant. It might have appeared from the return that it would not have been possible to obtain the deposition of White before the trial date of February 7, 1945. However, the record does not disclose any attempt was made to contact James White to ascertain the probability of his appearing as a witness for and on behalf of the defendant. It was necessary to show such attempt had been made without success. The court will take judicial notice of the fact that it is only about a day's drive from Altus, Oklahoma, to Camden, Arkansas, where the said witness, James White, was supposed to be. Moreover, the record does not show that any effort was made to obtain the witness' deposition, either before or after the return of the subpoena was made. It is not unreasonable to assume that even after the return of the subpoena, it was improbable that the deposition of White could have been taken. Neither is there any allegation of facts upon which the court could be assured that either the witness or his evidence, as set forth in the defendant's affidavit, would be available, even if a continuance were granted. There was no showing made that James White was still in Arkansas, or that he had been in any wise contacted relative to the possibility of his testifying, or that, if he appeared as a witness, or testified by deposition, that he would testify as the defendant swore he would. Under these circumstances, the status of White as a witness and the nature of his testimony were highly speculative. Moreover, the affidavit shows little diligence except the issuance and return of

a subpoena which was not served. The record is totally lacking in evidence as to any other attempt or effort to procure his presence as a witness at the trial on February 7, 1945, or at any time in the future. In Simmons v. State, 68 Okla. Cr. 337, 98 P. 2d 623, 624, this court said:

"An application for continuance on account of the absence of a witness must show diligence has been used to procure the witness or his testimony."

See, also, Kidd v. State, 76 Okla. Cr. 213, 136 P. 2d 210. In Presley v. State, 76 Okla. Cr. 120, 134 P. 2d 595, 597, this court said, in quoting from Petty v. State, 11 Okla. Cr. 438, 147 P. 782:

"An affidavit for continuance on the ground of the absence of material witnesses, who are out of the state, which states that the defendant expects to procure their attendance at the next term of court, to be sufficient should state the grounds of such expectation, so that the court may determine whether or not it is reasonable."

Also see Rucker v. State, 64 Okla. Cr. 259, 79 P. 2d 629.

We do not believe, under this state of the record, that the defendant has pleaded or established a case which shows the exercise of due diligence to obtain the presence of James White as a witness. The defendant's objection in this connection is based upon the following portion of the record:

"Mr. Horton: Well, I take exceptions to the court. There is another witness here also. And I would like to, in that connection I would like to put, unless they agree the witness is out of the state, if they will agree to that, the first witness. The Court: I will let you show that defendant can testify to all the things that witness can. Mr. Horton: The law also says I don't have to put the witness on. The Court: I will let you show that at the

trial. I overrule your affidavit, and show exceptions. Mr. Horton: Let it also (show) Mr. Harrison attempted to serve a subpoena on the negro, the witness White, and he couldn't find him and it was reported he had left town. Mr. Harrison: That's right. The Court: It is a matter of record. The only reason I am overruling that, (is) it is corroborative testimony."

Particularly, this contention is based on the statement in which the court says the only reason for overruling the motion for continuance is that the testimony would merely be corroborative of that given by the defendant. Counsel for defendant, in his brief, fails to set forth that part of the record pertinent to this contention, as follows:

"Mr. McCuistion, of counsel for the State:

"I would like to show we agree on behalf of this last witness (James White) that if he were present he would so testify and you can read that affidavit in the record."

The record discloses that the defendant did not avail himself of this agreement on the part of the state. In view of this agreement on behalf of the state, if any injury resulted to the defendant's rights, it was because of the fact that he did not avail himself of the agreement that he could read into the record his own affidavit as to what White purportedly would have testified to. Moreover, the defendant would have had all the benefit of what he alleged White's knowledge to be which was material and beneficial to his case, without any of the detriment of cross-examination of White. As to the testimony of J. R. Lauderdale, another absent witness (a white man), the defendant availed himself of a similar agreement on behalf of the state and read the affidavit of Lauderdale into the record. Under this state of the record, we cannot see how the defendant was prejudiced by the lack of

White's presence. If so, it was only because of his oversight in failing to read his own affidavit as to what White's testimony would have been. Because of this failure, he cannot now be heard to complain.

Based upon that portion of the record, as above quoted by the defendant in his brief, he then complains in the face of this record that without the testimony of witness White, he would be compelled "to take the witness stand" and "to testify against himself." In this connection, he cites the case of Knight v. State, 73 Okla. Cr. 107, 118 P. 2d 258, which is clearly not in point with the circumstances involved in this case, as the rule laid down in that case was applicable to the situation where two defendants were charged jointly with the crime of larceny of livestock. The plea of self-defense was not involved in the Knight case and in that case, no one other than the absent witness could establish Knight's contention as to certain facts, except his brother who was jointly charged with him. Not to have granted the continuance would have forced the brother, a joint defendant, to take the witness stand, where otherwise it might not have been necessary. The elements involved in that case are certainly not analogous to the case at bar. A different situation arises in a case where the defendant pleads self-defense and where the evidence presented by the state creates a situation where the issue of self-defense is totally lacking. In other words, the evidence offered by the state, as here, discloses a case of what appears to be premeditated murder, unprovoked by any overt act, of the deceased, at the time of the homicide. In the case at bar, it was essential to his defense that the defendant take the witness stand to establish overt acts of the deceased as the principal elements of self-defense. This is true because none

of the eyewitnesses to the homicide testified to any overt acts tending to establish a case of self-defense, such as that the deceased reached for his gun before the defendant shot him. It appears from their testimony, in substance, that Fields came into the room operated by Miller, the deceased; that Fields had some conversation with the deceased about the accusation he had made, to the effect that the defendant Fields had taken some money from him to which the deceased Miller, in substance, said that that was his belief and he had a right to his opinion. The defendant said, in substance, I am tired of your messing with me, or messing in my business; and Miller, the deceased, said, "You can't rob me of my belief." Whereupon the defendant said, "Don't you say nothing," and the defendant drew his pistol. Willie Dee Jenkins said, "Don't do that," and another witness said, "Don't do that," and just then the defendant discharged the gun and shot Jerry Miller in the left side of the head, above the ear. None of the witnesses, on behalf of the state, testified in any manner whatsoever to any overt act on the part of the deceased, such as his reaching for his gun, as a predicate for the plea of self-defense on the part of the defendant. Under the circumstances in the case at bar, it was essential that the defendant personally take the witness stand and testify to certain overt acts which he claimed to have been made by the deceased, leading him to believe that he was in danger of suffering great bodily harm or losing his life, and, tending to establish a case of self-defense. All the other evidence was to the contrary. This court has repeatedly held that evidence of threats claimed to have been made by the deceased would not be admissible in the absence of testimony presenting the issue of self-defense. In White v. State, 4 Okla. Cr. 143, 111 P. 1010, 1011, it was said:

"Threats made by the deceased against the defendant are not admissible in evidence when there is no testimony presenting the issue of self-defense."

See, also, Saunders v. State, 4 Okla. Cr. 264, 111 P. 965, 966, Ann. Cas. 1912B, 766, wherein this court said, in relation to bare threats:

"* * * such proof is not admissible at all unless there is first introduced some evidence other than that of the threats themselves tending to show that the deceased at the time he was killed was making some overt act or demonstration which furnished the defendant reasonable cause to believe that he was in danger of being killed or of receiving great bodily injury at the hands of the deceased."

A case in point with this situation is that of Hoover v. State, 35 Tex. Cr. R. 342, 33 S. W. 337, cited with approval in Reed v. State, 2 Okla. Cr. 589, 103 P. 1042. In the Hoover case [35 Tex. Cr. R. 342, 33 S. W. 338], the court in analyzing a situation analogous to the one at bar, said:

"But conceding that defendant's version is correct, the state replies that he is estopped from pleading that his life or body was in danger, because he did that which, if not intended, was in its very nature calculated, to induce the deceased to do just what he did do, and that appellant must have known and did know that his own violent conduct caused the deceased to act as he did, and this was known to appellant before he shot. A.'s life is threatened by B. A. arms himself with a pistol, and goes into the house of B. pistol in hand, ready for immediate use, and remarks to him: 'I understand that you intend to kill me.' B. moves his hand to his side. A. shoots, and kills him. Under this state of case, B. would have been excused if he had drawn and fired. But what in fact was appellant's intention when he entered the saloon, or why or for what reason did he kill deceased? It is true, he states that deceased threw his hand to his side, and that

he was moving towards the counter, and that he feared that his purpose was to obtain a pistol. Concede all this. Concede that appellant believed his life in danger, that in fact deceased was attempting to procure a pistol for the purpose of killing appellant, and that appellant so understood his conduct. Still his own violent conduct was not only calculated to induce deceased so to act, but was the natural result of the conduct of appellant. No rational man could have expected anything else than a a resort to deadly weapons. And while it may be true that appellant had good reason to, and did, from the conduct of deceased, apprehend danger to his life, etc., yet he knew that his own acts had caused the danger. But why did appellant kill deceased? He answers this question by deliberately stating that he did not kill deceased because of the insulting language towards his female relative, but because he (deceased) had threatened to kill him. If this be true, all that deceased did ceases to be a factor in self-defense. Why? Because the acts of deceased did not induce appellant to kill him, he being killed because he had threatened to kill appellant. We have therefore this simple proposition: A. threatens to kill B. B. arms himself, goes in the house of A., and kills him because he had threatened his (B.'s) life. There is neither manslaughter, self-defense, nor anything else short of murder, in this state of case."

In Reed v. State, supra [2 Okla. Cr. 589, 103 P. 1053], this court said:

"Where it is clearly and unequivocally shown that the defendant was the aggressor, and there is no pretense that the deceased was about to carry the threats into execution, or that the defendant had reasonable grounds to believe and did believe that such was the case, evidence of such threats by the deceased, although they were communicated to the defendant, is inadmissible."

The plea of self-defense, in the case at bar, was not apparent from any other evidence, and became apparent only when the defendant took the stand in his own behalf, and evidence of threats was not admissible until

then. Where the defendant had no evidence other than his own, by which he could establish his plea of self-defense, he had no choice than to take the witness stand and testify on his own behalf to establish such plea. Until the plea of self-defense was established by some evidence, testimony such as the witness James White would have testified to, as to threats, would not be admissible. So, the contention on the part of the defendant that in overruling the motion for continuance the court assumed the attitude of forcing him to take the witness stand in his defense and he therefore suffered substantial prejudice, is without merit.

Furthermore, without objection from the state, Archie Childs, a witness for the state, testified at considerable length on cross-examination as to the fact of certain threats being made by the deceased to the defendant to the effect that the deceased, Jerry Miller, was going to kill the defendant. As to the defendant attempting to contact the sheriff, seeking advice and protection, what the witness White would have testified to in this regard is substantially established by the testimony of Mrs. Kimbell, the wife of the sheriff, to the effect that the defendant did seek to find the sheriff. Therefore, the testimony of James White, as the trial judge concluded, would only have been cumulative had White been present and testified, as the defendant said he would have, in his affidavit. The testimony of White, in our opinion, would not have changed the result and it was not reversible error to refuse to continue the case in order that White might be present and testify. In Jackson v. State, 72 Okla. Cr. 226, 114 P. 2d 953, 954, this court said:

"Where the evidence is only cumulative, it was not error to overrule the motion for continuance."

See, also, Linder v. State, 54 Okla. Cr. 435, 23 P. 2d 222; Roberts v. State, 36 Okla. Cr. 28, 251 P. 612; Rose v. State, 8 Okla. Cr. 294, 127 P. 873.

Under the circumstances herein involved, with relation to the request for continuance based upon the affidavit as to what James White would testify, is without merit.

We have carefully examined the record in this case and are of the opinion that the evidence in this case shows that the killing of the deceased was more the result of fear than an act of self-defense. This court has held that "No person has a right to kill another through unfounded fear or cowardice." Reed v. State, supra. Fear, due to threats alone, unaccompanied by some overt act designed to execute the threats, will not mitigate a homicide. Saunders v. State, supra. Under these circumstances, we are of the opinion that the defendant was most fortunate in being found guilty only of first degree manslaughter and being sentenced to ten years in the penitentiary, as the record clearly could have supported conviction for murder and a much more severe penalty. While the record is not entirely free of error, it is clear as to the guilt of the defendant. We have no reason to believe but that upon a second trial, an intelligent and honest jury could arrive at no other verdict than the guilt of the accused. Therefore, under the harmless error doctrine, which has been firmly established in this court since its creation under the statutes of this state, 22 O. S. A. § 1068, and numerous authorities construing the same, finding no fundamental errors going to the substantial rights of the defendant, the judgment and sentence of the lower court is accordingly affirmed.

BAREFOOT, P. J., and JONES, J. concur.