Carol Jean JAGGERS, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–75–759.

Court of Criminal Appeals of Oklahoma.

April 23, 1976.

Don Anderson, Public Defender, Oklahoma County, for appellant.

Larry Derryberry, Atty. Gen., for appellee.

OPINION

BUSSEY, Judge:

Appellant, Carol Jean Jaggers, hereinafter referred to as defendant, was charged, tried and convicted in the District Court, Oklahoma County, Case No. CRF-75-417, for the offense of Murder in the Second Degree, in violation of 21 O.S. Supp., 1975, § 701.2. Her punishment was fixed at an indeterminate sentence of not less than ten (10) years nor more than Life in the State penitentiary. From said judgment and sentence defendant has perfected a timely appeal to this Court.

At trial Janie Marie Coverdale testified that on January 30, 1975, her address was 1819 Crab Apple Court, in Oklahoma City. On that date Carol Jean Jaggers, who she identified in court as the defendant, was staying with her and at approximately 2:30 p. m. on that date the defendant went into a bedroom to use the telephone. Upon defendant's return she related to witness Coverdale that Billy Davis (the deceased) was coming over. The two then agreed that they would not answer the door when Davis arrived. Thereafter, Davis knocked on the door and neither the defendant nor the witness answered the door. However, he entered without anyone opening the door for him. Witness Coverdale went down the stairs and met Davis and she related to him that she did not know where the defendant was or how to get in touch with her. At this time the deceased pushed past her, ran up the stairs and asked of the witness, "If Carol isn't here, what is her purse and coat doing here?" The deceased and witness Coverdale then went downstairs and talked. Davis then went back upstairs and found defendant hiding behind a door in a bedroom. The defendant told the deceased that he should apologize to witness Coverdale for entering her house uninvited. Davis returned downstairs and apologized to witness Coverdale and then went back upstairs to talk to defendant. At this time witness Cover-

dale was talking on the telephone to her son when she heard a gunshot. She ran to the stairs and observed the deceased coming down the stairs, holding himself and bleeding. The defendant was standing at the top of the stairs with a shotgun in her hands. Witness Coverdale then identified various photographs of her house and the gun which defendant was holding, State's Exhibits Nos. 1 through 15.

Witness Coverdale further testified that she had often seen the deceased with a pistol, and that approximately a week before the shooting the deceased had called her from Chicago, telling her that if the defendant did not "talk to him right" he was going to kill her and blow up the whole building. She had seen bruises on the defendant's body not long before the shooting. Further, she testified that the defendant had told her she was afraid of the deceased, and for that reason she had left him. After the shooting there was blood "all over" her kitchen floor and approximately three weeks later she found a pistol with blood on it in a kitchen cabinet.

Geraldine Rogers testified that on January 30, 1975, she was at Janie Coverdale's home at approximately 2:30 p. m. She and Janie Coverdale were downstairs talking on the telephone to Janie's son when they heard a gunshot. Janie ran to the stairway and exclaimed, "Billy has been shot." Davis came down the stairway and lay on the floor. The defendant was standing at the top of the stairs with a shotgun in her hands. Witness Rogers further testified that she knew the deceased and that his reputation was that of a violent man. She further testified that he carried a pistol most of the time, and had threatened to shoot his brother on one occasion.

Larry Foreman testified he was employed by the Oklahoma City Police Department and that on January 30, 1975, at approximately 2:30 p. m., he went to Crab Apple Court to investigate a shooting. Two women there told him that there had been a shooting. He proceeded inside the residence and observed the deceased on the floor struggling to get up. The defendant, who was at the top of the stairs, said that she had shot him. She told Officer Foreman where the gun was and he retrieved it. The officer identified the gun in court as State's Exhibit No. 16.

James G. Hill testified he was employed by the Oklahoma City Police Department. He then identified State's Exhibits Nos. 2 through 15 as being the photographs which he took on the afternoon of the shooting. He pointed out "quite a bit of blood-like substance, mostly in droplet form" in the kitchen area. He further pointed out a small area of powder burn on the deceased's coat as being the entry wound.

Les McCaleb testified he was employed by the Oklahoma City Police Department, and that he interrogated the defendant on two occasions, after having first advised defendant of her Miranda warnings. She related to him that she had had marital difficulties with the deceased, causing her to leave him. The deceased had beat her on several occasions, however, on the day of the shooting he had not beaten her. When the defendant left the deceased she took her four children to her parents' home in Ardmore and moved into Janie Coverdale's apartment. She had learned that the deceased was married to another woman. On the date of the shooting she and Janie Coverdale were at the latter's apartment and, when they learned the deceased was coming, they decided not to admit him into the apartment. Shortly thereafter, they heard a knock on the door and Davis entered the apartment without anyone admitting him. Janie Coverdale met the deceased and detained him in the downstairs area. Defendant heard the deceased ask Janie Coverdale where defendant was but did not hear the reply because defendant hid in an upstairs bedroom. The deceased then went upstairs and discovered her hiding in the bedroom, and thereafter they talked awhile. The deceased wanted her to return and live with him and threatened her with bodily harm if she refused. The deceased then left the

bedroom and went downstairs. Then the defendant got a double barreled shotgun and as the deceased got about half way down the stairs he turned around and it appeared that he was coming back up. At that time the shotgun discharged and she blacked out, not remembering subsequent events.

The State and the defendant then stipulated that if Dr. A. J. Chapman, the State Medical Examiner, were called to testify he would testify that the deceased was a muscular, 6 foot, 190 pound man, and that an autopsy revealed that he died of a gunshot wound to the neck and chest.

The State then rested.

Anthony Jaggers testified in behalf of the defense that he was the 15-year-old son of the defendant. He and his mother had lived with the deceased, his stepfather, for approximately one year. The deceased was a "high tempered" violent man, and he had seen the deceased beat his mother before. He had tried to help his mother on occasions when the deceased had beaten her and the deceased had threatened him with a gun.

Ray Jaggers testified that he was the defendant's brother and that he knew the deceased. The deceased had a bad reputation for being a violent man. He had observed the deceased threaten Anthony Jaggers, the defendant's 15-year-old son.

Janie Coverdale then testified on behalf of the defendant that after the shooting she washed blood off her kitchen cabinets. On February 22, 1975, she discovered a pistol with dried blood on it in one of her kitchen cabinets. She also found a glass on her kitchen floor after the shooting which the deceased had in his hand when he came down the stairs after the shooting.

The defendant then took the stand in her own behalf and testified that she was 30-years-old, had rheumatic fever, an enlarged heart and weighed 98 pounds. She had four children by a previous marriage. She and the deceased obtained a marriage license and were married in Gainesville, Texas, in 1974. She and the deceased had lived together for approximately one year. In January of 1975, the deceased had "knocked [her] up at the side of the head," whipped her with a rabbit ear antenna and beat her with his fists. He had beaten her on numerous occasions. The deceased carried a pistol and had threatened her and her children with it. When the deceased came into the bedroom on the day of the shooting she saw the bulge of a pistol under his jacket. During the conversation with the deceased, he stated "I want to talk to you and you're my wife and wherever you go I told you I was going; I told you I was going to kill you if you won't go back to the house; I will batter your brains out or kill you one." The defendant told the deceased that he owed Janie Coverdale an apology for entering her apartment uninvited. The deceased then left and went downstairs, returning later. After the deceased returned he started talking about what he was going to do, "batter my head in and all this." The defendant then testified that she might have had the shotgun in her hand at this time but she was not sure. As the deceased was coming up the stairs she was afraid of him. She did not remember pulling the trigger. She denied telling Officer McCaleb that the deceased was halfway down the stairs when he was shot. She did not remember the shooting. The defense then rested.

The defendant's sole assignment of error asserts that the jury was improperly instructed.

■ The record in the instant case reveals that the trial court found that the evidence did necessitate an instruction on selfdefense and accordingly instructed the jury. The trial court further instructed the jury on the lesser offense of First Degree Manslaughter committed in the "heat of passion." However, no instruction defining the term "heat of passion" was given. Thus, defendant predicates her alleged error on the trial court's failure to so in-

struct and cites in support the case of *Morgan v. State,* Okl.Cr., 536 P.2d 952 (1975).

This Court in *Morgan,* supra, stated:

"We, therefore, further hold, that in every *future* prosecution for murder, wherein the evidence necessitates an instruction upon self-defense, the trial court shall also instruct upon voluntary or first degree manslaughter committed in the heat of passion as a lesser included offense. . . . instructions in substantial compliance with those set forth in the Appendix[1] hereto, should be submitted to the jury." (Emphasis added)

It therefore appears that *Morgan,* supra, was prospective only and is not applicable to the instant case.[2]

The record reveals that the defendant objected orally to all the court's instructions, however, no written alternative instructions were presented to the court and requested to be given. In the case of *Schapansky v. State,* Okl.Cr., 478 P.2d 912 (1971), this Court held in the first paragraph of the Syllabus:

"Where counsel is not satisfied with instructions that are given, or desires court to give any particular instruction, or to more definitely or sufficiently state any propositions embraced in instructions, it is the duty of counsel to prepare and present to the court such desired instructions and request that it be given and in absence of such request, Court of Criminal Appeals will not reverse case if instructions generally cover subject matter of inquiry."

And, in the case of *Farrar v. State,* Okl. Cr., 505 P.2d 1355 (1973), this Court, quoting from *Fields v. State,* 85 Okl.Cr. 439, 188 P.2d 231 (1947), stated:

" ' * * * Where counsel for the defendant is not satisfied with instructions given by the court and desires additional or different instructions, other than the instructions given by the court, they must reduce such instructions to writing and request that they be given, and a conviction will not be reversed where there is a failure to make such request unless the Criminal Court of Appeals is of the opinion in the light of the entire record and instructions, that, because of failure to instruct upon some material question of law, accused has been deprived of a substantial right.' "

After a careful review of the court's instructions it is our opinion that the instructions given by the trial court generally cover the subject matter of inquiry of this case and that the defendant was deprived of no substantial right. For the foregoing reasons and authority, it is our opinion that the defendant has waived the right to challenge the trial court's instructions on appeal.

While we are of the opinion that the evidence amply supports the verdict, we believe that this would be a proper case for probation and recommend that counsel for defense apply to the District Court for a suspended sentence under the provisions of 22 O.S., § 994. The judgment and sentence is, accordingly, *AFFIRMED.*

BRETT, P. J., and BLISS, J., concur.

---

1. Suggested Instruction No. 2, in the Appendix, defines the term "heat of passion."

2. *Morgan,* supra, was handed down by this Court on May 16, 1975, and the instant case was tried on May 6 and 7, 1975.